**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X   **Docket No.**
KATHYANN SMART,

                          Plaintiff,            <u>**COMPLAINT**</u>

             -against-

USA LABOR FOR HIRE, INC., RC GLOBAL       **PLAINTIFF DEMANDS**
ENERGY GROUP, INC., and OLEG TSIMBLER,     **A TRIAL BY JURY**
*In His Official and Individual Capacities,*

                         Defendants.
-----------------------------------------------------------X

      PLAINTIFF KATHYANN SMART, by her attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of the DEFENDANTS, upon information and belief, as follows:

<u>**NATURE OF THE CASE**</u>

1.     PLAINTIFF complains pursuant to <u>Title VII of the Civil Rights Act of 1964</u>, as codified*, <u>42 U.S.C.</u> §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("<u>Title VII</u>"), the <u>New York State Human Rights Law, New York State Executive Law</u> §§296, *et seq.* ("<u>NYSHRL</u>"), the <u>New York City Human Rights Law</u>, <u>New York City Administrative Code</u> §§ 8-107, *et seq.* ("<u>NYCHRL</u>") and seeks damages to redress the injuries PLAINTIFF has suffered as a result of being **<u>discriminated against</u>** on the basis of her **sex/gender, race/color, and national origin**. Further, PLAINTIFF asserts that she was subject to **<u>retaliation</u>** and a hostile work environment for engaging in protected activities and complaining about discriminatory abuse.

2.     PLAINTIFF also makes claims herein for misclassification leading to illegal wage violations under the Fair Labor Standards Act ("<u>FLSA</u>"); violations of the <u>New York State Labor Law</u> ("<u>NYLL</u>") and breach of contract as PLAINTIFF was not paid, not paid timely,

not reimbursed for employment-related expenses, not given the benefits of an employment agreement made between the Parties and was not paid a fair minimum wage in accordance with the law.

3.     Also, PLAINTIFF asserts a claim for defamation *per se* against DEFENDANT OLEG TSIMBLER for disparaging PLAINTIFF'S chastity and professional reputation.

4.     At all times relevant, PLAINTIFF KATHYANN SMART was employed as a "Project Manager" and "Assistant" at/with DEFENDANTS, USA LABOR FOR HIRE, INC. and DEFENDANT RC GLOBAL ENERGY GROUP INC.

5.     PLAINTIFF was an employee of DEFENDANTS, but DEFENDANTS continued to misclassify her as an independent contractor.

6.     During her employment, PLAINTIFF was subjected to ongoing, continuous, and systematic sexual/gender-based discrimination by her manager DEFENDANT OLEG TSIMBLER. Among other things, DEFENDANT OLEG TSIMBLER repeatedly and routinely referred to PLAINTIFF as a "***Cyka***," "***fucking cyka***," "***stupid cyka***." The word "Cyka" means "*bitch*" in the Russian/Ukrainian language. DEFENDANT OLEG TSIMBLER made sexually inappropriate comments to PLAINTIFF, such as commenting about PLAINTIFF'S sex life and personal sexual relationships, while accusing PLAINTIFF of wild sexual behavior. DEFENDANT OLEG TSIMBLER humiliated and embarrassed PLAINTIFF in front of her coworkers, business affiliates, and friends with sexual innuendo and inappropriate allegations of sexual activity. Also, DEFENDANT OLEG TSIMBLER occasionally called PLAINTIFF "***sexy Katya***" and other sexually inappropriate phrases. All of the above actions against PLAINTIFF were committed by DEFENDANT OLEG TSIMBLER due to PLAINTIFF'S sex/gender.

7.     PLAINTIFF was subjected to ongoing, continuous, and systematic race/color-based

discrimination by her manager DEFENDANT OLEG TSIMBLER. Among other things and verbal abuse, DEFENDANT OLEG TSIMBLER referred to PLAINTIFF and her community, which is primarily African American/Black in racially derogatory ways.

8.     As for the Black people in PLAINTIFF'S community, DEFENDANT OLEG TSIMBLER referred to same as "***stupid***," "***lazy***," and "***lazy black people***," while making further derogatory statements such as, "***I can't drive around in your neighborhood, look at this***," "***black people will spend their money on the biggest car but can't afford to pay rent***" and similar statements. PLAINTIFF protested the statements and was met with further insults from DEFENDANT OLEG TSIMBLER.

9.     But then, DEFENDANT OLEG TSIMBLER began repeatedly referring to PLAINTIFF in the same manner as "***stupid***," "***dumb***" and "***lazy***." DEFENDANT OLEG TSIMBLER did not call PLAINTIFF'S non-African American/Black coworkers in this way.

10.     While subjecting PLAINTIFF to an abusive hostile work environment based on her characteristics, DEFENDANT OLEG TSIMBLER also refused and intentionally failed to pay PLAINTIFF in accordance with the FLSA and the NYLL. PLAINTIFF was misclassified as an independent contractor and was not provided with proper employment documents because DEFENDANTS were trying to avoid paying payroll taxes for PLAINTIFF. PLAINTIFF was not compensated for her overtime hours worked or for working holidays, nights, etc. PLAINTIFF was not given proper tax filing documents and whenever PLAINTIFF asked for proper documentation consistent with her employment, PLAINTIFF was subject to further verbal abuse, harassment, promises to correct, and intimidation.

11.     PLAINTIFF brings this Action charging that COLLECTIVE DEFENDANTS', collectively and/or individually, discriminated against PLAINTIFF on the basis of her

gender and/or sex, race, color, and national origin. PLAINTIFF also asserts that COLLECTIVE DEFENDANTS engaged in unlawful employment practices under the FLSA and New York Labor Laws.

## **JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES**

12. Jurisdiction of this Court is proper under 42 U.S.C. §2000e-5(f)(3) and 28 U.S.C. §§1331 and 1343.

13. The Court has supplemental jurisdiction over the claims that PLAINTIFF has brought under State and City law pursuant to 28 U.S.C. § 1367.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as one or more Defendants reside within the Eastern District of New York or the acts complained of occurred therein.

15. PLAINTIFF has satisfied all of the procedural prerequisites for the commencement of the instant action by: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 23, 2020; (b) receiving a Notice of Right to Sue from the EEOC on September 22, 2020; (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC; and (d) contemporaneously with the filing of this Complaint, mailing copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code.

16. A copy of the Notice of Right to Sue is annexed hereto as Exhibit A.

17. A copy of the transmittal letter to the NYCCHR, *et ano.*, is annexed hereto as Exhibit B.

## **PARTIES**

18. **PLAINTIFF KATHYANN SMART (hereinafter "PLAINTIFF")** is a female, who worked for DEFENDANT USA LABOR FOR HIRE, INC. as a "Project Manager" and

"Assistant" to its Principal DEFENDANT OLEG TSIMBLER.

19.     **DEFENDANT USA LABOR FOR HIRE, INC. (hereinafter "USALFH")** is a business corporation operating under the laws of the State of New York, with its principal executive place of business located at 2807 West 15th Street, Brooklyn, New York 11235. DEFENDANT USALFH boasts that it has "over 600 people working for different companies and various fields." http://besthotelcleaning.com/our-story/ DEFENDANT USALFH claims to provide "the industry with professional housekeepers, housemen, drivers, call-center agents, front desk attendants, and food and beverage department employees." As per its own admission, DEFENDANT USALFH employs well-more than 15 employees.

20.     **DEFENDANT RC GLOBAL ENERGY GROUP INC**., **(hereinafter "RCGEG")** is a domestic business corporation duly formed under the laws of the State of New York, Kings County, and is located at 501 Brightwater Court, #114, Brooklyn, New York 11235. Upon information and belief, DEFENDANT RCGEG employs 15 or more employees.

21.     Upon information and belief, DEFENDANT OLEG TSIMBLER owns, operates, and/or controls both DEFENDANTS USALFH and RDGEG.

22.     Upon information and belief, **DEFENDANTS, USALFH and RCGEG (hereinafter "CORPORATE DEFENDANTS")**, are **joint employers** over PLAINTIFF as they share common management, offices, officers, human resources, and personnel functions. PLAINTIFF performed work for both entities and both companies paid PLAINTIFF for her work and held-out PLAINTIFF as their project manager.

23.     **DEFENDANT OLEG TSIMBLER (hereinafter "TSIMBLER")** is the Owner and/or Principal of DEFENDANT USALFH. At all times, DEFENDANT TSIMBLER had the ability to affect the terms and conditions of PLAINTIFF'S employment. Upon Information

and belief, DEFENDANT TSIMBLER is a Caucasian male, who was born in the Ukraine.

24. **DEFENDANTS, USALFH, RDGEG, and TISIMBLER**, are collectively referred to herein as **"COLLECTIVE DEFENDANTS."**

## **FACTUAL ALLEGATIONS**

25. In or around June 2017, PLAINTIFF was initially hired by DEFENDANT USALFH as a "Project Manager."

26. PLAINTIFF was promised by DEFENDANT TSIMBLER that a Project Manager position was being created for her and that PLAINTIFF would have to complete different tasks for the company while the position was being created/finalized.

27. Upon her hire, and as inducement to accept the position, DEFENDANT TSIMBLER promised PLAINTIFF a salary.

28. Though DEFENDANT USALFH did not offer health benefits to its employees and this was a concern for PLAINTIFF, who had two young children to take care of.

29. In response, DEFENDANT TSIMBLER stated that PLAINTIFF could find health insurance and he would pay for same.

30. DEFENDANT TSIMBLER also promised PLAINTIFF fringe benefits; offered to set up a 401K for PLAINTIFF; also promised PLAINTIFF a company vehicle, persuading PLAINTIFF not to buy her own vehicle, and other terms and conditions of employment.

31. As a result of the promises made to PLAINTIFF by COLLECTIVE DEFENDANTS, PLAINTIFF accepted the position and began working for DEFENDANT USALFH.

32. At all times, PLAINTIFF was an above satisfactory employee and performed her duties without any performance issues. PLAINTIFF was qualified for her position/title.

33. However, following her accepting the position, despite her dedication to the job, nothing that was promised to PLAINTIFF was actually given to her by COLLECTIVE

DEFENDANTS.

34.   COLLECTIVE DEFENDANTS did not pay PLAINTIFF a steady salary and instead, paid PLAINTIFF at DEFENDANT TSIMBLER'S convenience, contrary to the New York Labor Laws.

35.   COLLECTIVE DEFENDANTS did not give PLAINTIFF paystubs or records concerning her payments.

36.   COLLECTIVE DEFENDANTS did not give PLAINTIFF on-boarding documents to complete, nor did COLLECTIVE DEFENDANTS provide PLAINTIFF with a record of her payments/salary. PLAINTIFF was never given a Form W-2 as is customary at the end of each year.

37.   COLLECTIVE DEFENDANTS intentionally refused to create or provide PLAINTIFF with these employment documents and/or information and did not create or maintain any such documentation for PLAINTIFF.

38.   DEFENDANT TSIMBLER did not pay PLAINTIFF bi-weekly or timely. Instead, he paid PLAINTIFF whenever he felt like it – usually after PLAINTIFF would complain about nonpayment.

39.   Indeed, when PLAINTIFF raised concerns about not being paid, DEFENDANT TSIMBLER would place money in PLAINTIFF'S hand, instead of a check, and would expect PLAINTIFF to accept the money.

40.   Further, the money placed in PLAINTIFF'S hand by DEFENDANT TSIMBLER was way less than what PLAINTIFF was promised and/or expected at the time of her hire.

41.   PLAINTIFF was never given consistent pay in a manner that would allow her to determine what yearly salary she was actually being paid.

42.   Further, upon information and belief, COLLECTIVE DEFENDANTS did not properly

report to the State or Federal Governments that PLAINTIFF was an employee or was getting compensation as an employee.

43. COLLECTIVE DEFENDANTS intentionally failed to maintain proper records of PLAINTIFF'S employment and compensation, and refused to properly report same, in violation of Federal and State laws.

44. PLAINTIFF continued to protest these actions taken by COLLECTIVE DEFENDANTS to no avail.

45. DEFENDANT TSIMBLER continued to ignore PLAINTIFF and caused her to continue to work without adequate and steady compensation.

46. Reimbursement for expenses paid by PLAINTIFF was also never timely – if it came at all.

47. PLAINTIFF routinely went for weeks before being reimbursed (if at all).

48. On many occasions, PLAINTIFF was not reimbursed for expenses she laid-out in furtherance of her job duties.

49. DEFENDANT TSIMBLER intentionally refused to reimburse PLAINTIFF and would make it an extremely uncomfortable task for PLAINTIFF whenever she sought a return of her expenses.

50. PLAINTIFF was not given anything that she was promised by DEFENDANT TSIMBLER and most certainly did not get what she was entitled to under Federal and State laws.

51. In fact, PLAINTIFF could not afford health insurance for herself and children because she was not getting paid enough and DEFENDANT TSIMBLER did not help PLAINTIFF to procure health insurance as he promised.

52. PLAINTIFF was eventually forced to seek health insurance coverage for her children under her husband's insurance plan due to COLLECTIVE DEFENDANTS' dishonesty and bad faith. This was particularly difficult for PLAINTIFF as she was separated from her husband

at the time.

53. PLAINTIFF continued to ask DEFENDANT TSIMBLER when he would make good on his promises and provide her with the items offered before she was hired.

54. In response, DEFENDANT TSIMBLER would tell PLAINTIFF things such as "*don't worry, I will take care of it/you*" to keep PLAINTIFF working under false promises and hope.

55. PLAINTIFF was also caused to work over 40 hours per week at times, with unrealistic deadlines, and would also work on weekends and holidays without proper compensation.

56. COLLECTIVE DEFENDANTS never kept records of the hours worked by PLAINTIFF, including hours over 40 hours per week, and did not report same to the State or Federal governments.

57. Upon information and belief, to this day, COLLECTIVE DEFENDANTS do not have proper employment records or a personnel file for PLAINTIFF despite her working for COLLECTIVE DEFENDANTS for three years.

58. Shortly after her hire, PLAINTIFF was advised that she would serve as an Assistant to the DEFENDANT USALFH'S Principal and owner, DEFENDANT TSIMBLER.

59. This was not the position offered to PLAINTIFF originally and PLAINTIFF did not expect to be an Assistant when she was hired.

60. Nevertheless, as PLAINTIFF was told that COLLECTIVE DEFENDANTS were working on creating her Project Manager position, PLAINTIFF remained patient and did the tasks that she was instructed to do in the meantime.

61. As an Assistant, PLAINTIFF'S duties involved doing anything asked of her by DEFENDANT TSIMBLER to further DEFENDANT USALFH'S business.

62. Among other things, PLAINTIFF was asked to take care of business-related, as well as

DEFENDANT TSIMBLER'S personal tasks (including babysitting his daughter) on a daily basis.

63. PLAINTIFF was asked to perform quality assurance functions, on video, for the Company (including visiting and inspecting hotel locations serviced by DEFENDANT USALFH), which would eventually be used on DEFENDANT USALFH'S website and advertising to promote DEFENDANT USALFH'S business.

64. In fact, DEFENDANT TSIMBLER often proclaimed that he needed PLAINTIFF to help him and DEFENDANT USALFH with their purpose and COLLECTIVE DEFENDANTS often asked PLAINTIFF to represent DEFENDANT USALFH with regard to its business interests.

65. PLAINTIFF was asked to be a sales representative for DEFENDANT USALFH and to procure and manage service accounts with hotels.

66. In furtherance of this duty, PLAINTIFF was asked by DEFENDANT TSIMBLER to be a location supervisor, wherein PLAINTIFF would supervise DEFENDANT USALFH'S employees that were cleaning different locations and hotels serviced by DEFENDANT USALFH.

67. Although DEFENDANT TSIMBLER made PLAINTIFF perform the tasks of a location supervisor, DEFENDANT TSIMBLER never formally offered PLAINTIFF the title.

68. Initially, when PLAINTIFF was hired, DEFENDANT TSIMBLER promised that he would match or exceed PLAINTIFF'S former salary at her previous job and would make sure that PLAINTIFF had health insurance.

69. However, DEFENDANT TSIMBLER began giving PLAINTIFF money in cash, then started to deposit $500 - $700 into PLAINTIFF'S account per week.

70. On other occasions, COLLECTIVE DEFENDANTS continued to pay PLAINTIFF by

putting cash – of unpredictable amounts - in her hand.

71. COLLECTIVE DEFENDANTS did not take out payroll taxes and/or report PLAINTIFF'S employment and compensation to the Federal/State/City Governments as required by law.

72. PLAINTIFF would inquire about what the money was for because she could not tell what she was being paid for by cash, in hand, from her employer.

73. In response, DEFENDANT TSIMBLER would give cryptic and confusing responses.

74. After months being asked to perform personal and business-related tasks for DEFENDANT TSIMBLER without clear purpose, PLAINTIFF began to complain and continued to ask for a job description of her roles and duties.

75. COLLECTIVE DEFENDANTS never provided PLAINTIFF with a job description as requested.

76. Instead, COLLECTIVE DEFENDANTS would give PLAINTIFF any task and tell her, in sum and substance, "*I need you to do this in the meantime, while we prepare your project manager position*."

77. In frustration, PLAINTIFF would complain to DEFENDANT TSIMBLER about the fact that she had no clear role or duties and was being asked to do any miscellaneous task needed by DEFENDANT TSIMBLER.

78. PLAINTIFF'S concerns were ignored and, to make matters worse, DEFENDANT TSIMBLER started to call PLAINTIFF his "*assistant*" to DEFENDANT USALFH clients and others with whom DEFENDANTS, USALFH and/or TSIMBLER, did business.

79. PLAINTIFF was distressed and humiliated by this title, which was not what she signed up for when she accepted employment at DEFENDANT USALFH.

80. PLAINTIFF was intentionally misclassified as an independent contractor by COLLECTIVE DEFENDANTS, although PLAINTIFF was promised that she was an

employee and despite PLAINTIFF'S repeated efforts to get proper paperwork and a Form W-2 from COLLECTIVE DEFENDANTS.

81.   In the beginning of the year 2018, PLAINTIFF received a Form 1099 from DEFENDANTS, USALFH and/or RCGEG. PLAINTIFF was unfamiliar with what a 1099 was at the time and expected to receive a Form W-2 like a typical employee.

82.   PLAINTIFF asked Alana (Last Name Unknown) ("Alana"), the Office Manager, to explain what a Form 1099 was and why PLAINTIFF was being given same.

83.   Alana responded that the Form 1099 is just how DEFENDANT TSIMBLER paid all of his employees.

84.   Confused, PLAINTIFF asked DEFENDANT TSIMBLER about the Form 1099 and asked if DEFENDANTS, USALFH and/or RCGEG, was paying the required (Social Security) taxes on her income.

85.   DEFENDANT TSIMBLER stated, "*of course*" at first. Then, DEFENDANT TSIMBLER later told PLAINTIFF that she would have to pay her own taxes at the end of each year.

86.   PLAINTIFF continued to inquire about her status and DEFENDANT TSIMBLER continued to promise PLAINTIFF that he would correct the issue and provide PLAINTIFF with a proper Form W-2.

87.   PLAINTIFF continued to work while waiting for COLLECTIVE DEFENDANTS to fulfill their promise.

88.   PLAINTIFF was never given the proper form (Form W-2) and continued to inquire for same repeatedly.

89.   At no time did DEFENDANT TSIMBLER tell PLAINTIFF that he considered her an independent contractor or a non-employee.

90.   Indeed, DEFENDANT TSIMBLER continued to hold himself out as PLAINTIFF'S "boss"

to PLAINTIFF and the public.

91.   COLLECTIVE DEFENDANTS misclassified and continued to pay PLAINTIFF as an independent contractor in order to avoid paying payroll taxes for PLAINTIFF (and other employees).

92.   Nevertheless, PLAINTIFF rendered daily services to COLLECTIVE DEFENDANTS, as an employee, which were integral to COLLECTIVE DEFENDANTS' businesses and daily operations as alleged herein.

93.   PLAINTIFF was employed by, and rendered services for, DEFENDANTS, USALFH and RCGEG, continuously and exclusively for three years.

94.   During this time, PLAINTIFF remained "on-call" (as per DEFENDANT TSIMBLER) and was required to remain available for DEFENDANT TSIMBLER 24 hours a day, seven days a week.

95.   DEFENDANT TSIMBLER contacted PLAINTIFF, for whatever business-related reason(s), at any and all hours of the day/night – sometimes requiring PLAINTIFF to meet him at various locations on the whim and without prior scheduling.

96.   COLLECTIVE DEFENDANTS provided PLAINTIFF with funds to pay the businesses' expenses and also gave PLAINTIFF authority to represent the businesses and its interests with clients, vendors, business partnerships, and affiliates, in the U.S. and abroad.

97.   PLAINTIFF was under the DAILY control and supervision of DEFENDANT TSIMBLER and had to comply with DEFENDANT TSIMBLER'S instructions, directions, requests, and orders and had to perform same in the manner directed by DEFENDANT TSIMBLER.

98.   PLAINTIFF did not have a choice with regard to how she performed her duties and had to comply with DEFENDANT TSIMBLER'S orders, or was faced with (and did actually receive) repeated threats of termination, threats against employment, adverse employment

actions, discipline, summary suspensions, etc.

99.   With regard to COLLECTIVE DEFENDANTS' business operations in Grenada, West Indies (described further below), PLAINTIFF was sent to Grenada by COLLECTIVE DEFENDANTS and COLLECTIVE DEFENDANTS promised to sponsor and pay for PLAINTIFF'S business-related expenses.

100.   PLAINTIFF was also offered a share of income from one of the businesses profits in Grenada as enticement to convince PLAINTIFF to accept the assignment – though COLLECTIVE DEFENDANTS later declined to adhere to this offer.

101.   With regard to personnel issues, PLAINTIFF reported same to COLLECTIVE DEFENDANTS' Office Manager, as well as DEFENDANT TSIMBLER, for resolution.

102.   PLAINTIFF was required to provide COLLECTIVE DEFENDANTS with periodic reports regarding her daily employment-related tasks.

103.   PLAINTIFF had no independent business operation apart from her employment with COLLECTIVE DEFENDANTS.

104.   PLAINTIFF could make no independent business judgments regarding the performance of her duties. She was compelled to adhere to COLLECTIVE DEFENDANTS' directions.

105.   PLAINTIFF, individually, was directly hired to work for COLLECTIVE DEFENDANTS and directly compensated for said work.

106.   PLAINTIFF was an employee of COLLECTIVE DEFENDANTS, not an independent contractor.

**PLAINTIFF Faced Daily Discrimination, Harassment, and Retaliation at USALFH:**

107.   Beginning in or around November 2017 and continuing **daily and routinely** <u>**for the duration of her employment**</u> at DEFENDANT USALFH, DEFENDANT TSIMBLER began to subject PLAINTIFF to a racial, sexual, gender-based hostile work environment

and discriminatory abuse due to PLAINTIFF'S race and gender.

108.   Among other things, on a daily basis for the length of her tenure at DEFENDANT USALFH, PLAINTIFF was subjected to bullying, harassment, verbal abuse/insults, sexual talk/statements, offensive comments, inappropriate personal questions regarding her sexual nature, and slanderous comments about her sexual activity and professional acumen.

109.   PLAINTIFF was one of two Black female employees in DEFENDANT USALFH'S office.

110.   PLAINTIFF was the only employee at DEFENDANT USALFH that was treated in the manner described above, and not given a clear title, compensation, or employment documents.

111.   And, PLAINTIFF seemed to be the only employee being subjected to the types of discriminatory abuse, by DEFENDANT TSIMBLER, described below.

112.   On a constant and daily basis, beginning in or around November 2017 to the present, PLAINTIFF was called "*Cyka*," which means "***bitch***" in the Ukraine.

113.   Indeed, DEFENDANT TSIMBLER would refer to PLAINTIFF as a "**Cyka**" or bitch verbally, in person and by phone, and also in text messages every single day.

114.   DEFENDANT TSIMBLER would refer to PLAINTIFF as a "*Cyka*" in front of her co-workers and others in the office.

115.   At first, PLAINTIFF did not know what "*Cyka*" meant and endeavored to find out the definition. When PLAINTIFF learned what "*Cyka*" actually meant, PLAINTIFF became angry and was humiliated.

116.   PLAINTIFF began to protest being disrespected and called "*Cyka*" by DEFENDANT TSIMBLER.

117.   In response to PLAINTIFF'S protected activity (protesting the discriminatory insults), DEFENDANT TSIMBLER would sometimes apologize and act appropriately for only a

short time.

118. But, soon thereafter, DEFENDANT TSIMBLER would resume his discriminatory insults against PLAINTIFF.

119. On other occasions, DEFENDANT TSIMBLER would simply ignore PLAINTIFF'S concerns about being called "*Cyka*" and continue the insults without stopping.

120. PLAINTIFF became DEFENDANT TSIMBLER'S designated employee for discriminatory abuse.

121. DEFENDANT TSIMBLER began to amplify his insults by telling PLAINTIFF to "***shut up stupid***" on countless occasions.

122. DEFENDANT TSIMBLER also called PLAINTIFF "***a swindler***," "***lazy***" and also told PLAINTIFF that she had "***no brain***" without him.

123. DEFENDANT TSIMBLER would also tell PLAINTIFF often called PLAINTIFF "***stupid***" and would tell PLAINTIFF to "***shut up***" in front of her coworkers.

124. On other occasions, DEFENDANT TSIMBLER would: interrupt PLAINTIFF while she was speaking in meetings among coworkers or business partners; tell PLAINTIFF (and others) that she "*doesn't know anything*" and that he "*made [Plaintiff] who she was*;" tell PLAINTIFF to "*stop talking*" in a humiliating manner and/or would waive his hands at PLAINTIFF in a terse and dismissive manner in order to tell PLAINTIFF to stay quiet.

125. DEFENDANT TSIMBLER did not refer to PLAINTIFF'S non-Black, female coworkers in this manner or treat any of them similarly.

126. DEFENDANT TSIMBLER also made racially derogatory comments about the neighborhood wherein PLAINTIFF lived.

127. Specifically, DEFENDANT TSIMBLER, while giving PLAINTIFF a ride home stated, "***I can't drive around in your neighborhood, look at this***." DEFENDANT TSIMBLER

continued "***black people will spend their money on the biggest car but can't afford to pay rent***."

128.   DEFENDANT TSIMBLER began to chastise PLAINTIFF about her community and African American and/or Black people who reside therein.

129.   DEFENDANT TSIMBLER also called the people in PLAINTIFF'S community "***stupid***," "***dumb***" and "***lazy black people***."

130.   "***Stupid***," "***dumb***" and "***lazy***" were terms often used by DEFENDANT TSIMBLER to describe PLAINTIFF because of her race and color. So, PLAINTIFF clearly understood that DEFENDANT TSIMBLER'S references to the people in her community in the same manner (Stupid, dumb, and lazy) was due to their race and color.

131.   DEFENDANT TSIMBLER continued to hoist these racially derogatory descriptions onto other Black people while having discussions with PLAINTIFF.

132.   PLAINTIFF did not understand what made DEFENDANT TSIMBLER so comfortable as to disparage Black people while speaking to her although she is also Black.

133.   PLAINTIFF felt degraded, humiliated, and angered by DEFENDANT TSIMBLER's racially derogatory commentary against her African Americans and Black neighbors, as well as her community.

134.   In response, PLAINTIFF said that DEFENDANT TSIMBLER'S comments were "*not true,*" offensive, and tried to explain that Black people were not all the same (protected activity).

135.   In response, DEFENDANT TSIMBLER tried to assure PLAINTIFF that he was not racist, (allegedly) "***liked Black people***" and had "***many black friends***."

136.   Despite this, DEFENDANT TSIMBLER would then continue with his racially derogatory tirades against Black people and PLAINTIFF'S community.

137. PLAINTIFF was being singled-out and talked to in whatever racially and/or sexually disrespectful manner DEFENDANT TSIMBLER preferred at any given moment because of PLAINTIFF'S race and sex/gender.

138. PLAINTIFF'S similarly situated non-Black coworkers were not subjected to similar abuse and mistreatment by DEFENDANT TSIMBLER.

139. PLAINTIFF, while in tears, would often protest the abuse and threaten to quit her employment.

140. But then, DEFENDANT TSIMBLER would apologize to PLAINTIFF, tell PLAINTIFF how important she was to him and the business, and beg her to stay – often convincing PLAINTIFF to stay with additional promises that were never fulfilled.

141. But then DEFENDANT TSIMBLER would continue to harass PLAINTIFF constantly with discriminatory insults, ridicule, and intimidation.

142. On occasion, DEFENDANT TSIMBLER referred to PLAINTIFF as "*sexy Katya*" due to her race/color and/or sex/gender.

143. DEFENDANT TSIMBLER would also try to have conversations with PLAINTIFF about her personal life, sex life and personal relationships.

144. This made PLAINTIFF extremely uncomfortable.

145. DEFENDANT TSIMBLER did not refer to PLAINTIFF'S similarly situated non-Black employees as "*sexy*," nor did he try to discuss sex and/or relationships with same as he did with PLAINTIFF.

146. DEFENDANT TSIMBLER did not have these discussions with his male employees at all – nor did he refer to his male employees as "*sexy*."

147. On several occasions, PLAINTIFF complained to DEFENDANT TSIMBLER, by phone and/or in person, and would start crying as she tried to explain the humiliation to which

she was being subjected.

148. In response, DEFENDANT TSIMBLER would reject PLAINTIFF'S complaints, tell PLAINTIFF to "***stop crying***" as though he were annoyed and would add "***I'm teaching you a lesson***."

149. PLAINTIFF'S complaints to DEFENDANT TSIMBLER were all in vain because DEFENDANT TSIBLER made it clear that he did not care about PLAINTIFF'S concerns.

150. DEFENDANT TSIMBLER made it clear that his discriminatory abuse of PLAINTIFF was intentionally being done to teach PLAINTIFF some sort of "*lesson*."

151. PLAINTIFF'S complaints to DEFENDANT TSIMBLER were futile.

152. COLLECTIVE DEFENDANTS had no good faith business justification for their collective and individual actions against PLAINTIFF.

153. Upon information and belief, despite their alleged number of employees, CORPORATE DEFENDANTS, USALFH and RCGEG, do not have a human resources department in place.

154. PLAINTIFF had no place to go to address her concerns about her lack of pay, unsteady pay, payment by cash-in-hand, lack of employment documents, lack of proof of employment, lack of pay stubs, and proof of compensation or other human resources issues.

155. Upon information and belief, CORPORATE DEFENDANTS, USALFH and RCGEG, do not have a human resources department or a person charged with the responsibility of taking and investigating complaints of discrimination and harassment.

156. Upon information and belief, despite their alleged number of employees, CORPORATE DEFENDANTS, USALFH and RCGEG, has no mechanism or reasonable avenue by which employees can raise concerns about workplace harassment, discrimination, and retaliation.

157. Upon information and belief, CORPORATE DEFENDANTS, USALFH and RCGEG, do not have an anti-discrimination policy in place.

158. CORPORATE DEFENDANTS, USALFH and RCGEG, employees, including management, are not trained or counseled with regard to discrimination in the workplace.

159. If CORPORATE DEFENDANTS, USALFH and/or RDGEG, did have an anti-discrimination policy in place, clearly, COLLECTIVE DEFENDANTS did not take said policies (if any) seriously.

160. Further, as DEFENDANT TSIMBLER was the principal and owner of DEFENDANT USALFH, there was no one that PLAINTIFF could complain to.

161. Indeed, PLAINTIFF tried to complain to Natalie (Last Name Unknown) ("Natalie"), the office accountant, and Lana (Last Name Unknown) ("Lana"), the office manager.

162. Some of the discriminatory and abusive conduct (including verbal abuse) committed by DEFENDANT TSIMBLER against PLAINTIFF took place in front of these two employees.

163. In response, Natalie said that there was not much she could do because DEFENDANT TSIMBLER would "*just yell at her too.*"

164. Lana responded by asking "*well why don't you just leave?*"

165. Instead of bringing PLAINTIFF'S concerns to the attention of DEFENDANT TSIMBLER, Lana advised PLAINTIFF that she should have just quit if she did not appreciate the hostile work environment.

166. PLAINTIFF understood that she had no recourse at DEFENDANTS, USALFH or RCGEG, and her complaints would fall on deaf ears.

167. PLAINTIFF began to liken her employment at DEFENDANTS USALFH /RCGEG to an abusive relationship wherein she was constantly abused, and then apologized to by her

abuser moments later, to convince her to stay in the toxic relationship.

168.    Nevertheless, PLAINTIFF could not leave her employment because she has children and other financial responsibilities, which she must solely take care of due to her recent marriage separation.

169.    PLAINTIFF could not afford to be unemployed, even for just a few weeks.

170.    Given the amount of work that she had to complete during the day, then attending to her two young children at night, PLAINTIFF had little time to look for alternate employment.

**PLAINTIFF Was Asked To Relocate To Grenada, West Indies, To Continue Work For TSIMBLER, USALFH, and/or RCGEG abroad:**

171.    In or around September / October 2019, DEFENDANT TSIMBLER asked PLAINTIFF to relocate to Grenada to take care of and manage DEFENDANTS, USALFH'S / RCGEG'S and/or TSIMBLER'S, operations in the country.

172.    DEFENDANTS, USALFH / RCGEG, established itself in Grenada and was opening and managing several businesses and projects in the country.

173.    PLAINTIFF is of Grenadian descent and DEFENDANT TSIMBLER thought that it would be a good idea to <u>use PLAINTIFF</u> to go to Grenada to represent his, DEFENDANTS, USALFH'S and DEFENDANT RCGEG'S, business interests in the country.

174.    The only reason that COLLECTIVE DEFENDANTS asked PLAINTIFF to represent them in Grenada was due to PLAINTIFF'S race/color and **<u>national origin</u>** – Grenadian.

175.    DEFENDANT TSIMBLER did not ask any of his non-Black, non-Grenadian employees to relocate to Grenada to represent DEFENDANTS, USALFH or RCGEG.

176.    DEFENDANT TSIMBLER'S intention was not in good faith because, as PLAINTIFF would soon learn, DEFENDANT TSIMBLER intended to send PLAINTIFF to the island country and then continue his abuse and force her to remain therein to represent DEFENDANTS, USALFH and RCGEG, under duress.

177.  PLAINTIFF was asked to relocate to Grenada for a period of at least six (6) months to a year so that DEFENDANT USALFH would have a continuous presence on the island and PLAINTIFF could manage and further the business and complete business-related tasks for DEFENDANT TSIMBLER on the island.

178.  At first, PLAINTIFF rejected the proposal/offer because she could not afford to relocate to Grenada with a family and small children here in the United States.

179.  Also, as PLAINTIFF was not receiving steady income from COLLECTIVE DEFENDANTS and was being harassed by DEFENDANT TSIMBLER daily, PLAINTIFF believed that relocating to Grenada would be a bad idea.

180.  DEFENDANT TSIMBLER continued to represent to PLAINTIFF that the relocation would be an awesome idea.

181.  DEFENDANT TSIMBLER began to make promises and offer PLAINTIFF many fringes, which he never intended to keep.

182.  DEFENDANT TSIMBLER made promises to PLAINTIFF knowing that he would breach said promises, act in bad faith, and place PLAINTIFF in an awkward position to force her to stay on the island once he got her there.

183.  PLAINTIFF was unaware of DEFENDANT TSIMBLER'S true intention.

184.  Nevertheless, PLAINTIFF saw DEFENDANTS', USALFH'S and RCGEG'S, interest in her native island, and DEFENDANT TSIMBLER'S request for her to be the corporate representative in charge of supervising CORPORATE DEFENDANTS' activities, as a good opportunity to return to her country and help the people there.

185.  In response to PLAINTIFF'S concerns, DEFENDANT TSIMBLER promised that he would pay for PLAINTIFF to bring her young child to Grenada and would also pay for a ticket for PLAINTIFF'S mother to help PLAINTIFF with childcare.

186.   PLAINTIFF'S child is asthmatic and his medical condition improves when he is in a warm climate. DEFENDANT TSIMBLER was well aware of this fact and used PLAINTIFF'S child as a further excuse as to why PLAINTIFF should relocate back to Grenada.

187.   DEFENDANT TSIMBLER mentioned PLAINTIFF'S child's health condition and the fact that bringing her son to Grenada would be beneficial to his health.

188.   DEFENDANT TSIMBLER offered to pay tuition for PLAINTIFF'S child to allow PLAINTIFF to enroll her child in private school on the island.

189.   DEFENDANT TSIMBLER also promised to pay for lodging, rent, utilities, and travel expenses while on the island for PLAINTIFF and her son.

190.   DEFENDANT TSIMBLER even connected PLAINTIFF with his attorney to get legal advice about relocating herself and her child in Grenada.

191.   PLAINTIFF would not have accepted the assignment to go to Grenada on behalf of COLLECTIVE DEFENDANTS if the above promises were not made by DEFENDANT TSIMBLER.

192.   In reliance upon the stated promises of DEFENDANT TSIMBLER, as well as based on the belief that PLAINTIFF was supposed to be funded and/or reimbursed to travel abroad for work-related reasons, PLAINTIFF agreed to go to Grenada.

193.   After weeks of convincing and promises by DEFENDANT TSIMBLER to set PLAINTIFF up on the island, PLAINTIFF (reluctantly) accepted the proposal.

194.   PLAINTIFF packed up her belongings, arranged for travel for her young son, uprooted herself from the United States, and moved to Grenada with her child in January of 2019.

195.   Upon her arrival to the island, PLAINTIFF began working for COLLECTIVE DEFENDANTS immediately as instructed.

196.   On behalf of DEFENDANTS, USALFH/RCGEG and TSIMBLER, and as per their

directives, PLAINTIFF was made to understand that CORPORATE DEFENDANTS and/or DEFENDANT TSIMBLER would be creating a television program for the island, which was similar to a wheel of fortune game show.

197.   In this regard, COLLECTIVE DEFENDANTS sent props and other items to Grenada to setup and prepare for the show. PLAINTIFF was put in charge of that project by COLLECTIVE DEFENDANTS and did setup same as directed.

198.   COLLECTIVE DEFENDANTS were also in process of buying land and property, upon which they were going to build business operations. In this regard, PLAINTIFF had to correspond with real estate lawyers and contractors in an effort to close on the property.

199.   PLAINTIFF was put in charge of that process by COLLECTIVE DEFENDANTS and did act on behalf of COLLECTIVE DEFENDANTS as directed.

200.   COLLECTIVE DEFENDANTS were also planning to start an island touring company called "GAM Magical Tours Grenada."

201.   COLLECTIVE DEFENDANTS promised PLAINTIFF that, for her efforts with GAM Tours, PLAINTIFF would receive a percentage of the proceeds of the business as an additional salary.

202.   COLLECTIVE DEFENDANTS asked PLAINTIFF help initiate and set up the touring company while she was in Grenada. PLAINTIFF was responsible for setting up the logistics of the operation and did so as directed.

203.   COLLECTIVE DEFENDANTS were also working on philanthropic projects with the Chinese government to donate or procure toys and school supplies for Grenadian children in need.

204.   PLAINTIFF was asked to spearhead this task as well on behalf of COLLECTIVE DEFENDANTS and did so as directed.

205. Also, COLLECTIVE DEFENDANTS were coordinating with churches and clergy in Grenada to start and manage afterschool programs and other various community development initiatives.

206. PLAINTIFF was asked to be the liaison between the clergy and COLLECTIVE DEFENDANTS with regard to these initiatives and did so as directed.

207. Further, DEFENDANTS and/or TSIMBLER opened a restaurant/café called Greenz Café and Lounge on the island as well and they asked PLAINTIFF to open, manage the facility, and take care of logistics.

208. PLAINTIFF started and managed the restaurant at first (as directed by COLLECTIVE DEFENDANTS) until the responsibility was given to DEFENDANT TSIMBLER'S brother to operate and manage.

209. Nevertheless, PLAINTIFF remained responsible for managing all of the paperwork related to all of DEFENDANTS and/or TSIMBLER'S venues and operations in Grenada.

210. PLAINTIFF did manage these operations as directed by COLLECTIVE DEFENDANTS.

211. However, PLAINTIFF immediately began to realize that she was facing more of the same breaches of promises, discriminatory abuse, and refusals to fulfill their responsibilities as PLAINTIFF'S employers.

212. PLAINTIFF was not given what she was promised in order to relocate and/or everything that PLAINTIFF was promised was met with resistance and push-back from DEFENDANT TSIMBLER whenever PLAINTIFF inquired about same.

213. COLLECTIVE DEFENDANTS intentionally and maliciously refused to support PLAINTIFF on the island and failed to pay for many of PLAINTIFF'S expenses.

214. COLLECTIVE DEFENDANTS would not pay PLAINTIFF'S rent in a timely fashion and kept PLAINTIFF in uncomfortable situations with her landlord.

215. Often, DEFENDANT TSIMBLER refused to pay rent for PLAINTIFF altogether.

216. When PLAINTIFF raised concerns about the fact that COLLECTIVE DEFENDANTS were not paying the rent and she was always under fear of eviction, DEFENDANT TSIMBLER responded: "***I don't care if the landlord puts you out in the streets, I am not paying rent for you***."

217. For obvious reasons, PLAINTIFF could not afford to be put out on the streets, especially with a young son living with her.

218. COLLECTIVE DEFENDANTS' refusal(s) and monthly delays in paying PLAINTIFF'S rent kept PLAINTIFF anxious, nervous and in constant fear of homelessness.

219. DEFENDANT TSIMBLER failed/refused to pay PLAINTIFF her salary on time according to their agreement.

220. Often and on a whim, DEFENDANT TSIMBLER would suspend or delay PLAINTIFF'S pay on a regular basis. PLAINTIFF did not have the benefit of knowing when, if at all, she would be paid.

221. DEFENDANT TSIMBLER often called this act, "***suspending [Plaintiff's] pay***" and would refuse to pay PLAINTIFF until he was ready.

222. Indeed, DEFENDANT TSIMBLER would send PLAINTIFF random small and/or inadequate payments, but only when he felt like it.

223. DEFENDANT TSIMBLER did not pay PLAINTIFF regularly and would pay PLAINTIFF whatever he wanted, whenever he decided to get to it.

224. PLAINTIFF continued to protest non-payment and late payments as was her right under the New York State and Federal Labor Laws. But DEFENDANT TSIMBLER would respond with retaliatory annoyance, anger and further discriminatory epithets.

225. Among other things, DEFENDANT TSIMBLER continued to refer to PLAINTIFF as a

"*Cyka*" and "*Lazy Cyka*" on a constant basis whenever PLAINTIFF tried to speak to him about payment, her employment, and the unfair situation(s) to which DEFENDANT TSIMBLER continued to subject her.

226. DEFENDANT TSIMBLER continued to humiliate and degrade PLAINTIFF while she was in Grenada because DEFENDANT TSIMBLER knew that PLAINTIFF was stuck there and could not leave without COLLECTIVE DEFENDANTS' assistance.

227. In addition to repeatedly referring to PLAINTIFF as a "*Cyka*" while she was in Grenada, DEFENDANT TSIMBLER made other discriminatory comments to PLAINTIFF based on her sex/gender.

228. DEFENDANT TSIMBLER would yell at and verbally abuse PLAINTIFF on a daily basis and then later call PLAINTIFF nicely and ask PLAINTIFF to complete work-related tasks – when he needed something done on the island.

229. Often, when PLAINTIFF complained about her working conditions, unfulfilled promises, and other abuse, DEFENDANT TSIMBLER would respond with rage, hang up on PLAINTIFF and not contact her for extended periods in retaliation.

230. DEFENDANT TSIMBLER would even block PLAINTIFF from calling him for days at a time without communication.

231. DEFENDANT TSIMBLER was aware that his actions would cause PLAINTIFF anxiety, financial injury and fear because she was working remotely.

232.  DEFENDANT TSIMBLER subjected PLAINTIFF to this abusive conduct to force PLAINTIFF to stop complaining.

233. One week while PLAINTIFF was taking approved time off, DEFENDANT TSIMBLER did not leave PLAINTIFF alone during this vacation and forced her to continue working.

234. When PLAINTIFF explained that she did not want to work because she was on vacation,

DEFENDANT TSIMBLER responded, "***get to work and stop chilling, driving around Grenada with men in cars you stupid cyka***!"

235. PLAINTIFF often worked and did tasks for COLLECTIVE DEFENDANTS on her free time while in Grenada because DEFENDANT TSIMBLER would insist and retaliate against PLAINTIFF if she asserted her rights.

236. PLAINTIFF did not understand why DEFENDANT TSIMBLER was accusing her of "*driving around with men*," but this was not the only time that DEFENDANT TSIMBLER humiliated PLAINTIFF based on her sex/gender while she was in Grenada.

237. In addition, DEFENDANT TSIMBLER <u>falsely accused</u> PLAINTIFF of being promiscuous, being sexually inappropriate with men in Grenada, and partying.

238. DEFENDANT TSIMBLER also claimed, without basis, that PLAINTIFF was engaging in multiple sexual relationships with men on the island.

239. In an effort to humiliate PLAINTIFF, DEFENDANT TSIMBLER spread rumors and gossiped with people, who PLAINTIFF worked with PLAINTIFF on the island, and told them that PLAINTIFF was "***sleeping around***" with various men in Grenada.

240. DEFENDANT TSIMBLER also often shared PLAINTIFF'S personal business with her coworkers and business affiliates in the U.S. and abroad in Grenada.

241. These accusations were false, lacked factual basis, and were designed to harass and humiliate PLAINTIFF based on her sex/gender and race, color, and national origin.

242. In addition to referring to PLAINTIFF as "***Sexy Katya***," DEFENDANT TSIMBLER would CONSTANTLY make inappropriate sexual comments to PLAINTIFF about men that "***want[ed] to fuck***" PLAINTIFF.

243. DEFENDANT TSIMBLER did not treat his non-Black, non-Grenadian or male employees in this manner, and did not make similar comments to PLAINTIFF'S co-workers.

244. On one occasion in 2019, while DEFENDANT TSIMBLER was in Grenada, PLAINTIFF introduced DEFENDANT TSIMBLER to one of her female friends on the island.

245. The next day, DEFENDANT TSIMBLER humiliated PLAINTIFF and began accusing PLAINTIFF of being "*a lesbian*" and having a sexual relationship with her female friend.

246. DEFENDANT TSIMBLER subjected PLAINTIFF to this discriminatory abuse because of PLAINTIFF'S sex/gender and race.

247. DEFENDANT TSIMBLER did not subject his similarly situated male and/or non-Black employees to this discriminatory and abusive conduct.

248. As PLAINTIFF continued to complain about her treatment and protest the discriminatory abusive actions of DEFENDANT TSIMBLER, TSIMBLER continued to retaliate against PLAINTIFF by leaving PLAINTIFF on the island without support or funds.

249. In fact, DEFENDANT TSIMBLER often told PLAINTIFF that he was intentionally leaving her stranded without support or funds in an effort "*to teach [PLAINTIFF] a lesson*" and/or because "*he did not care about her*" well-being.

250. DEFENDANT TSIMBLER made it clear that he was retaliating against PLAINTIFF for, in part, complaining and engaging in protected activity.

251. The "*lesson*" that TSIMBLER wanted to "*teach*" PLAINTIFF was to stop being a complainer and to stop engaging in protected activity.

252. Clearly, DEFENDANT TSIMBLER knew that his actions were designed to dissuade PLAINTIFF from complaining about DEFENDANTS' discriminatory abuse and employment-related violations and/or from engaging in protected activity.

253. On almost a daily basis, unless DEFENDANT TSIMBLER needed PLAINTIFF, DEFENDANT TSIMBLER would subject PLAINTIFF to fear and intimidation around the status of her employment in order to harass and abuse PLAINTIFF.

254. At any given time, PLAINTIFF did not know the status of her employment with DEFENDANTS, USALFH and/or RCGEG.

255. Sometimes, PLAINTIFF would think that she was terminated, until DEFENDANT TSIMBLER would call her and ask her to complete another work-related task in Grenada.

256. Often, DEFENDANT TSIMBLER left PLAINTIFF confused and not knowing if the rent or her expenses abroad would be paid.

257. Often, they were not paid and PLAINTIFF was forced to use her personal savings and funds to meet the business-related expenses – in violation of her agreement with DEFENDANTS, as well as the Labor Laws herein.

258. In or around February 2020, without adequate notice, DEFENDANT TSIMBLER advised PLAINTIFF that he was no longer going to pay for her expenses and that PLAINTIFF was "*on her own*" in Grenada.

259. On various occasions, DEFENDANT TSIMBLER left PLAINTIFF on the island without contact and would refuse to communicate with PLAINTIFF.

260. In addition to not fulfilling their promises to PLAINTIFF, COLLECTIVE DEFENDANTS left PLAINTIFF to address invoices, bills, and expenses with the little pay that PLAINTIFF had available.

261. Indeed, PLAINTIFF was forced to spend her savings to stay afloat in Grenada and was not reimbursed for same.

262. As of the date of this Complaint, PLAINTIFF'S savings account has been exhausted on expenses and bills related to her employment assignment abroad.

263. DEFENDANT TSIMBLER stopped paying for PLAINTIFF'S rent and expenses and intentionally left PLAINTIFF on her own, stranded, in Grenada.

264. But, as PLAINTIFF exhausted her own money, PLAINTIFF was unable to return to the

United States as PLAINTIFF did not have enough funds to transport herself and her belongings back to the United States.

265. PLAINTIFF continued to beg DEFENDANTS TSIMBLER, USALFH, RCGEG, and its employees, to help her return home.

266. PLAINTIFF continued to place COLLECTIVE DEFENDANTS on notice about her financial hardships and damages they were causing to her and her child.

267. In response, DEFENDANT TSIMBLER told PLAINTIFF, in no uncertain terms, "***I don't care***" and "***I don't care if you can't get back to the States, I am not giving you any more money***" and "***you can get thrown out of your apartment and live on the streets***."

268. For PLAINTIFF, being thrown out onto the street in a foreign country was not an option and DEFENDANT TSIMBLER knew this.

269. PLAINTIFF advised DEFENDANT TSIMBLER that she could not remain in Grenada without proper compensation and would be forced to return to the United States.

270. PLAINTIFF advised DEFENDANT TSIMBLER that she exhausted all of her funds and had no money to return.

271. DEFENDANT TSIMBLER was unmoved and maintained that he "*did not care*" about her circumstances or that PLAINTIFF was stranded in Grenada.

272. DEFENDANT TSIMBLER even told PLAINTIFF'S landlord in Grenada, who inquired of DEFENDANT TSIMBLER about the status of the rent, that PLAINTIFF was responsible for the rent and he would not pay same any longer.

273. PLAINTIFF was embarrassed, humiliated, and shamed as a result of DEFENDANT TSIMBLER'S actions.

274. PLAINTIFF was intentionally left stranded in Grenada in retaliation for engaging in protected activities.

275.   At all times, DEFENDANT TSIMBLER was well aware that his actions would cause PLAINTIFF to be stranded and face extreme financial hardship for herself and her young child.

276.   Callously, DEFENDANT TSIMBLER was not concerned about the hardship that he would leave PLAINTIFF facing.

277.   DEFENDANT TSIMBLER intended to cause PLAINTIFF great emotional harm and distress by leaving her stranded in Grenada.

278.   Upon information and belief, as he has done in the past, DEFENDANT TSIMBLER meant to cause PLAINTIFF such financial hardship and distress to force PLAINTIFF to continue to work for DEFENDANTS, USALFH and/or RCGEG, for little or no pay with hopes that she would be paid enough funds to return home.

279.   DEFENDANT TSIMBLER was trying to force PLAINTIFF to remain in Grenada and continue to manage COLLECTIVE DEFENDANTS' projects under duress.

280.   In furtherance of his malicious motives, DEFENDANT TSIMBLER eventually purchased a plane ticket for PLAINTIFF to return but did not pay for PLAINTIFF'S baggage fees and moving costs.

281.   DEFENDANT TSIMBLER knew that this would prevent PLAINTIFF, who exhausted her own funds, from being able to board the flight or leave the island.

282.   DEFENDANT TSIMBLER'S beliefs were correct as PLAINTIFF could not board her flight and missed same.

283.   PLAINTIFF advised DEFENDANT TSIMBLER that the ticket was inadequate and she could not board the flight to return home – to which DEFENDANT TSIMBLER responded, "*I don't care, I am not paying any more money*."

284.   DEFENDANT TSIMBLER then hung up on PLAINTIFF and refused to take her call(s).

285. As a result, PLAINTIFF was forced to leave the airport and return to the apartment that COLLECTIVE DEFENDANTS refused to pay for, hoping that the landlord would let her back in though rent was not paid.

286. Graciously, the landlord let her back into the apartment because he was aware of her desperate situation and DEFENDANT TSIMBLER'S abuse.

287. To add further insult to injury, DEFENDANT TSIMBLER and his employees refused to communicate with PLAINTIFF in any way, knowing that she remained stranded and in an extremely desperate situation abroad.

288. PLAINTIFF was forced to make final travel arrangements for herself and her son because DEFENDANTS refused any further assistance to PLAINTIFF.

289. Most of the above-described discriminatory and unlawful conduct was committed by DEFENDANT TSIMBLER against PLAINTIFF while DEFENDANT TSIMBLER was present in New York, Kings County.

290. **COLLECTIVE DEFENDANTS' actions and/or lack thereof was a <u>continuing violation</u> of PLAINTIFF'S rights.**

291. COLLECTIVE DEFENDANTS supported, condoned, ratified, and approved of the sexually, gender-based, and racially-hostile work environment against PLAINTIFF.

292. Despite the clear language of their policies, COLLECTIVE DEFENDANTS allowed an environment to exist wherein the complainer was retaliated against and was attacked with adverse employment actions for complaining about discrimination, unfair treatment, unlawful employment practices, violations of the Labor Laws, and other unlawful/unreasonable conduct.

293. INDIVIDUAL DEFENDANT TSIMBLER acted pursuant to his employment as an agent, employee, representative, and/or Principal of DEFENDANTS, USALFH and/or RCGEG.

294. COLLECTIVE DEFENDANTS, their employees, agents, representatives, and/or subordinates (including DEFENDANT TSIMBLER) had no good faith business justification for their individual and collective actions against PLAINTIFF.

295. COLLECTIVE DEFENDANTS' actions and conduct were intentional, grossly negligent, and intended to harm PLAINTIFF.

296. COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

297. Punitive damages are warranted against COLLECTIVE DEFENDANTS individually and collectively.

298. As a result of COLLECTIVE DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

299. As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

300. COLLECTIVE DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

301. As such, PLAINTIFF demands Punitive Damages as against all DEFENDANTS, jointly and severally.

## AS A *FIRST* CAUSE OF ACTION
## FOR *DISCRIMINATION* UNDER TITLE VII
### (*Against Corporate Defendants USALFH & RCGEG*)

302.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

303.   This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e *et seq*., for relief based upon the unlawful employment practices of the above-named CORPORATE DEFENDANTS. PLAINTIFF complains of CORPORATE DEFENDANT'S violation of Title VII's prohibition against discrimination in employment-based, in whole or in part, upon an employee's sex/gender, race, color, and national origin.

304.   CORPORATE DEFENDANTS engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e *et seq*., by discriminating against PLAINTIFF because of her sex/gender, race, color, and national origin.

305.   PLAINTIFF is African and/or Grenadian American and Black. PLAINTIFF is also female.

306.   During the course of her employment, PLAINTIFF was subjected to an ongoing and continuous barrage of discriminatory abuse, verbal abuse, insults, ridicule, humiliation, sexual comments, gender-based harassment, differential treatment, labor law violations, breach of contract and/or agreements, fraud and retaliation for engaging in protected activity – due to her sex/gender, race, color, and national origin.

307.   PLAINTIFF was fraudulently induced to travel abroad for discriminatory work-related reasons, based solely on her national origin.

308.   The discriminatory abuse and tortious conduct against PLAINTIFF continued and escalated after she relocated to Grenada on behalf of CORPORATE DEFENDANTS.

309.   DEFENDANTS have no policies, procedures, or departments in place to address

employment, personnel, or discrimination issues in the workplace.

310.   DEFENDANTS' principal and Owner, DEFENDANT TSIMBLER, was the main aggressor and harasser against PLAINTIFF, which left her with no recourse or viable options to complain.

311.   Further, all of PLAINTIFF'S complaints were futile and responded to with further insult and humiliation.

312.   PLAINTIFF'S work environment was hostile and permeated with discriminatory abuse, ridicule, and insult against PLAINTIFF due to her protected characteristics.

313.   DEFENDANTS selectively enforced their policies in a discriminatory manner to the detriment of PLAINTIFF.

314.   PLAINTIFF was not treated in a manner consistent with similarly-situated male and/or Non-Black or Non-Grenadian employees.

315.   At all times relevant, DEFENDANT TSIMBLER was/is the Owner and Principal of CORPORATE DEFENDANTS and he utilized his status and position to subject PLAINTIFF to the above-mentioned abusive conduct.

316.   CORPORATE DEFENDANTS are strictly and vicariously liable for the continuous, ongoing, and repetitive conduct of its Owner/Principal, DEFENDANT TSIMBLER.

317.   COLLECTIVE DEFENDANTS had no good faith basis for their conduct against PLAINTIFF.

318.   As a result of DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

319.   As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation

expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

320.  DEFENDANTS' conduct was malicious, willful, and conducted with full knowledge of the law.

321.  PLAINTIFF is entitled to the maximum amount allowed under this statute/law.

**AS A *SECOND* CAUSE OF ACTION FOR *RETALIATION*
UNDER TITLE VII
*(Against Corporate Defendants USALFH & RCGEG)***

322.  PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

323.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . . because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

324.  CORPORATE DEFENDANTS engaged in unlawful employment practice prohibited by 42 U.S.C. §§ 2000e *et seq*., by retaliating against PLAINTIFF with respect to the terms, conditions, or privileges of employment because of her repeated opposition to the unlawful employment practices of DEFENDANTS.

325.  PLAINTIFF continued to complain about, and object to, the discriminatory abuse she faced at the hands of her boss/manager DEFENDANT TSIMBLER and said complaints were ignored.

326. PLAINTIFF also tried to complain to the office manager, who could not help PLAINTIFF.

327. PLAINTIFF'S complaints were futile.

328. Instead, PLAINTIFF was further subjected to increased verbal abuse, increased discriminatory remarks and ridicule, withholding of pay/compensation, threats against employment, retaliation, hostile work environment, and adverse employment actions – in retaliation for engaging in protected activity.

329. DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

330. DEFENDANT TSIMBLER acted pursuant to his authority as Principal and Owner of DEFENDANTS, USALFH and RCGEG.

331. At all times, CORPORATE DEFENDANTS were aware and/or had actual and constructive notice of its sexual, gender-based, and racially-hostile work environment and took no action to abate or correct same.

332. Instead, DEFENDANTS attacked and retaliated against PLAINTIFF, who engaged in protected activity, while allowing TSIMBLER to escape discipline with impunity.

333. DEFENDANTS' purported anti-discrimination and anti-retaliation policies (if any) were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

334. But for INDIVIDUAL DEFENDANT'S TSIMBLER'S position at USALFH and RCGEG, DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

335. COLLECTIVE DEFENDANTS had no valid business justification for the retaliatory actions taken against PLAINTIFF following her engagement in protected activity.

336. PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

337.   DEFENDANTS, USALFH and RCGEG, are strictly liable for the conduct of its supervisor, manager, and owner DEFENDANT TSIMBLER.

338.   As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

339.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

340.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

### AS A THIRD CAUSE OF ACTION
### DISCRIMINATION UNDER *42 USC* § 1981
### *(Against All Defendants Individually & Collectively)*

341.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

342.   PLAINTIFF repeats and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

343.   *42 U.S.C.* § 1981 states in relevant part as follows:

   (a) Statement of equal rights

   All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every

kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. §1981

344.    PLAINTIFF, who is Black, was discriminated against, prevented from entering into or performing contracts, denied equal enjoyment of benefits and privileges of employment because of her race/color, as provided under *42 U.S.C.* § 1981, and has suffered damages as set forth herein.

345.    During her employment, PLAINTIFF was promised salary, bonuses, fringe benefits, company vehicles, health insurance and was also promised, by implication, that she would work in an environment free from discrimination, harassment, and abuse.

346.    DEFENDANTS breached each promise to PLAINTIFF and failed/refused to provide PLAINTIFF equal terms, conditions privileges, and immunities of employment, which were given to similarly situated non-Black coworkers and employees at DEFENDANTS, USALFH and RCGEG.

347.    PLAINTIFF was subjected to racial discrimination, discriminatory comments about herself, her race/color, other people of the same race/color, and her community at large.

348.    PLAINTIFF was degraded, ridiculed, insulted, treated differently, fraudulently induced, and constantly belittled by her boss, DEFENDANT TSIMBLER, due to her race/color.

349.    PLAINTIFF was asked to relocate to another country to be the face of her employers, in part, because of her race/color, and in part because of her nationality.

350.    But for PLAINTIFF'S race and color, PLAINTIFF would have been treated with dignity and respect like her similarly situated coworkers.

351. DEFENDANTS selectively enforced their policies in a discriminatory manner to the detriment of PLAINTIFF.

352. PLAINTIFF was not treated in a manner consistent with similarly-situated Non-Black or Non-Grenadian employees.

353. At all times relevant, DEFENDANT TSIMBLER was/is the Owner and Principal of CORPORATE DEFENDANTS and he utilized his status and position to subject PLAINTIFF to the above-mentioned abusive conduct.

354. CORPORATE DEFENDANTS are strictly and vicariously liable for the continuous, ongoing, and repetitive conduct of its Owner/Principal, DEFENDANT TSIMBLER.

355. COLLECTIVE DEFENDANTS have no good faith basis for their conduct against PLAINTIFF.

356. As a result of DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

357. As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

358. DEFENDANTS' conduct was malicious, willful, and conducted with full knowledge of the law.

359. PLAINTIFF is entitled to the maximum amount allowed under this statute/law.

### AS A FOURTH CAUSE OF ACTION
### RETALIATION UNDER *42 USC* § 1981
*(Against All Defendants Individually & Collectively)*

360.   PLAINTIFF repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

361.   By the acts and practices described above, DEFENDANTS retaliated against PLAINTIFF for her opposition to unlawful discrimination under 42 U.S.C. §1981.

362.   DEFENDANTS acted with malice and/or reckless indifference to PLAINTIFF'S statutorily protected rights.

363.   PLAINTIFF, who is African/Grenadian American and Black, was discriminated against, prevented from entering into or performing contracts, denied equal enjoyment of benefits and privileges of employment, and removed from employment because of her race/color as provided under *42 U.S.C.* § 1981 and has suffered damages as set forth herein.

364.   PLAINTIFF was subjected to a hostile work environment and/or a workplace that was permeated with racial bias, racially-motivated insults, racial animus, and derogatory racially-motivated language against African Americans and Black persons.

365.   PLAINTIFF was cherry-picked to take on tasks, such as relocating to Grenada to represent CORPORATE DEFENDANTS, specifically because of her race/color.

366.   Whenever PLAINTIFF complained about discriminatory treatment, she faced immediate and harsh retaliation, including but not limited to adverse employment actions, suspensions, terminations, docked pay, verbal abuse and humiliation, and other acts specifically intended to leave PLAINTIFF in financial hardship and financially destitute in retaliation for engaging in protected activity.

367.   PLAINTIFF was subjected to a hostile work environment and/or a workplace that was permeated with racial bias, racially-motivated insults, racial animus, and derogatory

racially-motivated language against African Americans and Black people.

368.   DEFENDANT TSIMBLER acted pursuant to his authority as Principal and Owner of DEFENDANTS, USALFH and RCGEG.

369.   At all times, CORPORATE DEFENDANTS were aware and/or had actual and constructive notice of its racially-hostile work environment and took no action to abate or correct same.

370.   Instead, DEFENDANTS attacked and retaliated against PLAINTIFF, who engaged in protected activity, while allowing DEFENDANT TSIMBLER to escape discipline with impunity.

371.   DEFENDANTS' purported anti-discrimination and anti-retaliation policies (if any) were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

372.   But for INDIVIDUAL DEFENDANT'S TSIMBLER'S position at DEFENDANTS, USALFH and RCGEG, DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

373.   COLLECTIVE DEFENDANTS had no valid business justification for the retaliatory actions taken against PLAINTIFF following her engagement in protected activity.

374.   PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

375.   DEFENDANTS, USALFH and RCGEG, are strictly liable for the conduct of its supervisor, manager, and owner DEFENDANT TSIMBLER.

376.   As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation

expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

377. COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

378. PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

**AS A FIFTH CAUSE OF ACTION**
**FOR VIOLATION OF THE MINIMUM WAGE PROVISIONS OF THE FLSA**
***(Against Corporate Defendants USALFH and RCGEG)***

340. PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

341. DEFENDANTS failed to pay PLAINTIFF at the applicable minimum hourly rate, in violation of 29 U.S.C. § 206(a).

342. DEFENDANTS' failure to pay PLAINTIFF at the applicable minimum hourly rate was willful within the meaning of 29 U.S.C. § 255(a).

343. Throughout her employment, PLAINTIFF was paid by personal check and/or cash-in-hand.

344. PLAINTIFF was not a manager, supervisor, nor was PLAINTIFF an exempt employee despite purportedly being salaried.

345. PLAINTIFF did not work set hours and PLAINTIFF worked whenever DEFENDANTS asked her to do so, often over and above 40 hours during any given workweek.

346. PLAINTIFF, a nonexempt and nonmanagerial employee, was also asked to travel abroad to represent CORPORATE DEFENDANTS but was not compensated adequately for the

time she worked abroad either.

347.   PLAINTIFF remained abroad 24 hours a day, 7 days a week, and was not compensated for her time.

348.   PLAINTIFF remained on call for DEFENDANTS and was often called to work on weekends, holidays, and after hours.

349.   Based on the number of hours worked by PLAINTIFF, abroad and in the U.S., PLAINTIFF was paid less than minimum wage.

350.   DEFENDANTS also failed to keep adequate records or document the time that PLAINTIFF worked, her overtime hours, after-hours work, holiday work, etc.

351.   DEFENDANTS did not pay PLAINTIFF any compensation for her hours worked at either a regular rate of pay or with any overtime premium for those weeks that led her to work more than forty hours per week.

352.   Throughout her employment, PLAINTIFF was not required to use any kind of clock-in or clock-out mechanism.

353.   PLAINTIFF complained to DEFENDANTS concerning her missing hours. She never received any response and, as of the date of this Complaint, remains unpaid for many hours worked for DEFENDANTS, USALFH or RCGEG.

354.   When PLAINTIFF complained about her pay, often, she was cut-off therefrom in retaliation for complaining.

355.   PLAINTIFF regularly handled goods and services in interstate and international commerce, on behalf of her employers, DEFENDANTS, USALFH and RCGEG.

356.   As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation

expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

357.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

358.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

## AS A SIXTH CAUSE OF ACTION
## FOR VIOLATION OF OVERTIME WAGE PROVISIONS OF THE FLSA

359.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

360.   DEFENDANTS failed to pay PLAINTIFF overtime compensation at rates of one and one-half times the regular rate of pay for each hour worked in excess of forty hours in a workweek, in violation of 29 U.S.C. § 207 (a)(1).

361.   DEFENDANTS' failure to pay PLAINTIFF overtime compensation was willful within the meaning of 29 U.S.C. § 255(a).

362.   PLAINTIFF did not work set hours and PLAINTIFF worked whenever DEFENDANTS asked her to do so, often over and above 40 hours during any given workweek.

363.   PLAINTIFF, a nonexempt and nonmanagerial employee, was also asked to travel abroad to represent CORPORATE DEFENDANTS but was not compensated adequately for the time she worked abroad either.

364.   PLAINTIFF remained abroad 24 hours a day, 7 days a week, and was not compensated for her time.

365.   PLAINTIFF remained on call for DEFENDANTS and was often called to work on

weekends, holidays, and after hours.

366. Based on the number of hours worked by PLAINTIFF, abroad and in the U.S., PLAINTIFF was paid less than minimum wage.

367. DEFENDANTS also failed to keep adequate records or document the time that PLAINTIFF worked, her overtime hours, after-hours work, holiday work, etc.

368. DEFENDANTS did not pay PLAINTIFF any compensation for her hours worked at either a regular rate of pay or with any overtime premium for those weeks that led her to work more than forty hours per week.

369. Throughout her employment, PLAINTIFF was not required to use any kind of clock-in or clock-out mechanism.

370. PLAINTIFF complained to DEFENDANTS concerning her missing hours. She never received any response and, as of the date of this Complaint, remains unpaid for many hours worked for USALFH or RCGEG.

371. When PLAINTIFF complained about her pay, often, she was cut-off therefrom in retaliation for complaining.

372. PLAINTIFF regularly handled goods and services in interstate and international commerce, on behalf of her employers, DEFENDANTS, USALFH and RCGEG.

373. As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and

other non-pecuniary losses.

374.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

375.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

376.   PLAINTIFF has been damaged in an amount to be determined at trial.

## AS A SEVENTH CAUSE OF ACTION - *DISCRIMINATION* UNDER NEW YORK STATE EXECUTIVE LAW

379.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

380.   New York State Executive Law § 296 provides that, "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's . . . race, color, gender/sex, national origin . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

381.   PLAINTIFF is African and/or Grenadian American and Black. PLAINTIFF is also female.

382.   During the course of her employment, PLAINTIFF was subjected to an ongoing and continuous barrage of discriminatory abuse, verbal abuse, insults, ridicule, humiliation, sexual comments, gender-based harassment, differential treatment, labor law violations, breach of contract and/or agreements, fraud and retaliation for engaging in protected activity – due to her sex/gender, race, color, and national origin.

383.   PLAINTIFF was fraudulently induced to travel abroad for discriminatory work-related reasons, based solely on her national origin.

384.   The discriminatory abuse and tortious conduct against PLAINTIFF continued and escalated after she relocated to Grenada on behalf of CORPORATE DEFENDANTS.

385.   DEFENDANTS have no policies, procedures, or departments in place to address employment, personnel, or discrimination issues in the workplace.

386.   DEFENDANTS' principal and Owner, DEFENDANT TSIMBLER, was the main aggressor and harasser against PLAINTIFF, which left her with no recourse or viable options to complain.

387.   Further, all of PLAINTIFF'S complaints were futile and responded to with further insult and humiliation.

388.   PLAINTIFF'S work environment was hostile and permeated with discriminatory abuse, ridicule, and insult against PLAINTIFF due to her protected characteristics.

389.   DEFENDANTS selectively enforced their policies in a discriminatory manner to the detriment of PLAINTIFF.

390.   PLAINTIFF was not treated in a manner consistent with similarly-situated male and/or Non-Black or Non-Grenadian employees.

391.   At all times relevant, DEFENDANT TSIMBLER was/is the Owner and Principal of CORPORATE DEFENDANTS and he utilized his status and position to subject PLAINTIFF to the above-mentioned abusive conduct.

392.   CORPORATE DEFENDANTS are strictly and vicariously liable for the continuous, ongoing, and repetitive conduct of its Owner/Principal, DEFENDANT TSIMBLER.

393.   COLLECTIVE DEFENDANTS had no good faith basis for their conduct against PLAINTIFF.

394.   As a result of DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

395.   As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other

compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

396.    DEFENDANTS' conduct was malicious, willful, and conducted with full knowledge of the law.

397.    PLAINTIFF is entitled to the maximum amount allowed under this statute/law.

## AS AN *EIGHTH* CAUSE OF ACTION FOR *RETALIATION*
## NEW YORK STATE EXECUTIVE LAW

398.    PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

399.    New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

400.    PLAINTIFF continued to complain about, and object to, the discriminatory abuse she faced at the hands of her boss/manager DEFENDANT TSIMBLER and said complaints were ignored.

401.    PLAINTIFF also tried to complain to the office manager, who could not help PLAINTIFF.

402.    PLAINTIFF'S complaints were futile.

403.    Instead, PLAINTIFF was further subjected to increased verbal abuse, increased discriminatory remarks and ridicule, withholding of pay/compensation, threats against employment, retaliation, hostile work environment, and adverse employment actions – in retaliation for engaging in protected activity.

404.    DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

405. DEFENDANT TSIMBLER acted pursuant to his authority as Principal and Owner of DEFENDANTS, USALFH and RCGEG.

406. At all times, CORPORATE DEFENDANTS were aware and/or had actual and constructive notice of its sexual, gender-based, and racially-hostile work environment and took no action to abate or correct same.

407. Instead, DEFENDANTS attacked and retaliated against PLAINTIFF, who engaged in protected activity, while allowing TSIMBLER to escape discipline with impunity.

408. DEFENDANTS' purported anti-discrimination and anti-retaliation policies (if any) were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

409. But for INDIVIDUAL DEFENDANT'S TSIMBLER'S position at DEFENDANTS, USALFH and RCGEG, DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

410. COLLECTIVE DEFENDANTS had no valid business justification for the retaliatory actions taken against PLAINTIFF following her engagement in protected activity.

411. PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

412. DEFENDANTS, USALFH and RCGEG, are strictly liable for the conduct of its supervisor, manager, and owner DEFENDANT TSIMBLER.

413. As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future

pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

414.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

415.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

**AS AN NINTH CAUSE OF ACTION *DISCRIMINATION & RETALIATION*
UNDER NEW YORK STATE EXECUTIVE LAW - *AIDER AND ABETTOR LIABILITY***
(*Against Individual Defendant TSIMBLER*)

416.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

417.   New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to **aid, abet**, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

418.   INDIVIDUAL DEFENDANT TSIMBLER engaged in an unlawful discriminatory practice in violation of New York State Executive Law § 296(6) by **aiding, abetting,** inciting, compelling, and coercing the discriminatory and retaliatory conduct of his employer, DEFENDANTS, USALGH and RCGEG.

419.   INDIVIDUAL DEFENDANT TSIMBLER, as a member of management, is liable for aiding and abetting DEFENDANTS, USALGH and RCGEG, in the discrimination and retaliation faced by PLAINTIFF.

420.   INDIVIDUAL DEFENDANT TSIMBLER utilized his management status/position to subject PLAINTIFF to, *inter alia*, discrimination as outlined above.

421.   DEFENDANT TSIMBLER selectively enforced DEFENDANTS', USALFH'S and RCGEG'S, policies in a discriminatory manner to the detriment of PLAINTIFF.

422.  PLAINTIFF was not treated in a manner consistent with similarly situated male, Non-Black, and/or Non-Grenadian employees.

423.  INDIVIDUAL DEFENDANT TSIMBLER had no good faith business justification for his actions against PLAINTIFF.

424.  At all times, INDIVIDUAL DEFENDANT TSIMBLER was acting pursuant to his authority and USALFH and RCGEG.

425.  INDIVIDUAL DEFENDANT TSIMBLER exposed PLAINTIFF to discrimination based on her gender/sex, race/color, and national origin.

426.  As a result of INDIVIDUAL DEFENDANT TSIMBLER'S actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

427.  As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

428.  COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

429.  PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

### AS AN *TENTH* CAUSE OF ACTION
### *DISCRIMINATION* UNDER THE NEW YORK CITY ADMINISTRATIVE CODE, NYC HUMAN RIGHTS LAW

430.  PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above

paragraphs of this complaint.

431.  The New York City Administrative Code § 8-107(1) provides that

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived . . . sex/gender, race, color, and national origin . . . to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

432.  COLLECTIVE DEFENDANTS engaged in an unlawful discriminatory practice in violation of New York City Administrative Code § 8-107(1)(a) by discriminating against PLAINTIFF because of her sex/gender, race/color, and national origin.

433.  PLAINTIFF is African and/or Grenadian American and Black. PLAINTIFF is also female.

434.  During the course of her employment, PLAINTIFF was subjected to an ongoing and continuous barrage of discriminatory abuse, verbal abuse, insults, ridicule, humiliation, sexual comments, gender-based harassment, differential treatment, labor law violations, breach of contract and/or agreements, fraud and retaliation for engaging in protected activity – due to her sex/gender, race, color, and national origin.

435.  PLAINTIFF was fraudulently induced to travel abroad for discriminatory work-related reasons, based solely on her national origin.

436.  The discriminatory abuse and tortious conduct against PLAINTIFF continued and escalated after she relocated to Grenada on behalf of CORPORATE DEFENDANTS.

437.  COLLECTIVE DEFENDANTS have no policies, procedures, or departments in place to address employment, personnel, or discrimination issues in the workplace.

438.  COLLECTIVE DEFENDANTS' principal and Owner, DEFENDANT TSIMBLER, was the main aggressor and harasser against PLAINTIFF, which left her with no recourse or viable options to complain.

439.  Further, all of PLAINTIFF'S complaints were futile and responded to with further insult

and humiliation.

440.   PLAINTIFF'S work environment was hostile and permeated with discriminatory abuse, ridicule, and insult against PLAINTIFF due to her protected characteristics.

441.   COLLECTIVE DEFENDANTS selectively enforced their policies in a discriminatory manner to the detriment of PLAINTIFF.

442.   PLAINTIFF was not treated in a manner consistent with similarly-situated male and/or Non-Black or Non-Grenadian employees.

443.   At all times relevant, DEFENDANT TSIMBLER was/is the Owner and Principal of CORPORATE DEFENDANTS and he utilized his status and position to subject PLAINTIFF to the above-mentioned abusive conduct.

444.   CORPORATE DEFENDANTS are strictly and vicariously liable for the continuous, ongoing, and repetitive conduct of its Owner/Principal, DEFENDANT TSIMBLER.

445.   COLLECTIVE DEFENDANTS had no good faith basis for their conduct against PLAINTIFF.

446.   DEFENDANTS, USALFH and RCGEG, are vicariously liable for the actions of its manager and supervisor against PLAINTIFF herein.

447.   DEFENDANTS, USALFH and RCGEG, through its manager DEFENDANT TSIMBLER, were aware and/or made aware of the discrimination, against PLAINTIFF.

448.   DEFENDANTS, USALFH and RCGEG, took no action against DEFENDANT TSIMBLER.

449.   DEFENDANTS had the power and authority to stop, prevent, and /or reverse the hostile environment against PLAINTIFF and refused/failed to do so. Instead, they allowed DEFENDANT TSIMBLER to continue to violate PLAINTIFF for discriminatory reasons.

450.   DEFENDANTS, USALFH and RCGEG, are vicariously liable for allowing

DEFENDANT TSIMBLER to violate PLAINTIFF employment based on her protected characteristics.

451.   As a result of COLLECTIVE DEFENDANTS' actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

452.   As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

453.   DEFENDANTS' conduct was malicious, willful, and conducted with full knowledge of the law.

454.   PLAINTIFF is entitled to the maximum amount allowed under this statute/law.

### AS AN *ELEVENTH* CAUSE OF ACTION *RETALIATION* UNDER THE NEW YORK CITY ADMINISTRATIVE CODE / NYC HUMAN RIGHTS LAW

455.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

456.   The *New York City Administrative Code* § 8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

457.   DEFENDANTS engaged in an unlawful discriminatory practice in violation of *New York City Administrative Code* § 8-107(7) by discriminating against PLAINTIFF because of PLAINTIFF'S opposition to the unlawful employment practices of DEFENDANTS.

458.   PLAINTIFF continued to complain about, and object to, the discriminatory abuse she faced at the hands of her boss/manager DEFENDANT TSIMBLER and said complaints were ignored.

459.   PLAINTIFF also tried to complain to the office manager, who could not help PLAINTIFF.

460.   PLAINTIFF'S complaints were futile.

461.   Instead, PLAINTIFF was further subjected to increased verbal abuse, increased discriminatory remarks and ridicule, withholding of pay/compensation, threats against employment, retaliation, hostile work environment, and adverse employment actions – in retaliation for engaging in protected activity.

462.   DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

463.   DEFENDANT TSIMBLER acted pursuant to his authority as Principal and Owner of DEFENDANTS, USALFH and RCGEG.

464.   At all times, CORPORATE DEFENDANTS were aware and/or had actual and constructive notice of its sexual, gender-based, and racially-hostile work environment and took no action to abate or correct same.

465.   Instead, DEFENDANTS attacked and retaliated against PLAINTIFF, who engaged in protected activity, while allowing DEFENDANT TSIMBLER to escape discipline with impunity.

466.   DEFENDANTS' purported anti-discrimination and anti-retaliation policies (if any) were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

467.   But for INDIVIDUAL DEFENDANT'S TSIMBLER'S position at DEFENDANTS, USALFH and RCGEG, DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

468.   COLLECTIVE DEFENDANTS had no valid business justification for the retaliatory actions taken against PLAINTIFF following her engagement in protected activity.

469.   PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

470.   CORPORATE DEFENDANTS are vicariously liable for the retaliatory actions of its manager/Principal, DEFENDANT TSIMBLER.

471.   DEFENDANTS, USALFH and RCGEG, are strictly liable for the conduct of its supervisor, manager, and owner DEFENDANT TSIMBLER.

472.   As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

473.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

474.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

### AS A TWELFTH CAUSE OF ACTION FOR *DISCRIMINATION & RETALIATION* UNDER THE NEW YORK CITY ADMINISTRATIVE CODE AIDER AND ABETTOR LIABILITY *(Against Individual Defendant TSIMBLER)*

475.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

476.   The New York City Administrative Code § 8-107(6) provides that it shall be unlawful

discriminatory practice: "For any person to **aid, abet**, incite, compel, or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

477. INDIVIDUAL DEFENDANT TSIMBLER, as a member of management, is liable for aiding and abetting DEFENDANTS, USALFH and RCGEG, in the discrimination and retaliation faced by PLAINTIFF.

478. INDIVIDUAL DEFENDANT TSIMBLER, as a member of management, is liable for aiding and abetting DEFENDANTS, USALFH and RCGEG, in the discrimination and retaliation faced by PLAINTIFF.

479. INDIVIDUAL DEFENDANT TSIMBLER utilized his management status/position to subject PLAINTIFF to, *inter alia*, discrimination as outlined above.

480. INDIVIDUAL DEFENDANT TSIMBLER selectively enforced DEFENDANTS', USALFH'S and RCGEG'S, policies in a discriminatory manner to the detriment of PLAINTIFF.

481. PLAINTIFF was not treated in a manner consistent with similarly situated male, Non-Black, and/or Non-Grenadian employees.

482. INDIVIDUAL DEFENDANT TSIMBLER had no good faith business justification for his actions against PLAINTIFF.

483. At all times, INDIVIDUAL DEFENDANT TSIMBLER was acting pursuant to his authority and DEFENDANTS, USALFH and RCGEG.

484. INDIVIDUAL DEFENDANT TSIMBLER exposed PLAINTIFF to discrimination based on her gender/sex, race/color, and national origin.

485. As a result of INDIVIDUAL DEFENDANT'S actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

486. As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered

loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

487. COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

488. PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

## AS A THIRTEENTH CAUSE OF ACTION
## FOR VIOLATION OF THE MINIMUM WAGE PROVISIONS OF THE NYLL

451. PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

452. DEFENDANTS paid PLAINTIFF less than the minimum wage, in violation of NYLL § 652(1) and supporting regulations.

453. DEFENDANTS' failure to pay PLAINTIFF at the applicable minimum hourly rate was willful within the meaning of NYLL § 663.

454. Throughout her employment, PLAINTIFF was paid by personal check and/or cash-in-hand.

455. PLAINTIFF was not a manager, supervisor, nor was PLAINTIFF an exempt employee despite purportedly being salaried.

456. PLAINTIFF did not work set hours and PLAINTIFF worked whenever DEFENDANTS asked her to do so, often over and above 40 hours during any given workweek.

457. PLAINTIFF, a nonexempt and nonmanagerial employee, was also asked to travel abroad

to represent CORPORATE DEFENDANTS but was not compensated adequately for the time she worked abroad either.

458.    PLAINTIFF remained abroad 24 hours a day, 7 days a week, and was not compensated for her time.

459.    PLAINTIFF remained on call for DEFENDANTS and was often called to work on weekends, holidays, and after hours.

460.    Based on the number of hours worked by PLAINTIFF, abroad and in the U.S., PLAINTIFF was paid less than minimum wage.

461.    DEFENDANTS also failed to keep adequate records or document the time that PLAINTIFF worked, her overtime hours, after-hours work, holiday work, etc.

462.    DEFENDANTS did not pay PLAINTIFF any compensation for her hours worked at either a regular rate of pay or with any overtime premium for those weeks that led her to work more than forty hours per week.

463.    Throughout her employment, PLAINTIFF was not required to use any kind of clock-in or clock-out mechanism.

464.    PLAINTIFF complained to DEFENDANTS concerning her missing hours. She never received any response and, as of the date of this Complaint, remains unpaid for many hours worked for DEFENDANT, USALFH or RCGEG.

465.    When PLAINTIFF complained about her pay, often, she was cut-off therefrom in retaliation for complaining.

466.    PLAINTIFF regularly handled goods and services in interstate and international commerce, on behalf of her employers, DEFENDANTS, USALFH and RCGEG.

467.    As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries

to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

468.    COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

469.    PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

470.     PLAINTIFF has been damaged in an amount to be determined at trial.

### AS A FOURTEENTH CAUSE OF ACTION
### FOR VIOLATION OF THE OVERTIME PROVISIONS OF THE NYLL

471.    PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

472.    DEFENDANTS failed to pay PLAINTIFF overtime compensation at rates of one and one-half times the regular rate of pay for each hour worked in excess of forty hours in a workweek, in violation of NYLL Art. 19 and 12 N.Y.C.R.R. § 142-2.2.

473.    DEFENDANTS' failure to pay PLAINTIFF overtime compensation was willful within the meaning of NYLL § 663.

474.    PLAINTIFF did not work set hours and PLAINTIFF worked whenever DEFENDANTS asked her to do so, often over and above 40 hours during any given workweek.

475.    PLAINTIFF, a nonexempt and nonmanagerial employee, was also asked to travel abroad to represent CORPORATE DEFENDANTS but was not compensated adequately for the time she worked abroad either.

476.    PLAINTIFF remained abroad 24 hours a day, 7 days a week, and was not compensated for

her time.

477. PLAINTIFF remained on call for DEFENDANTS and was often called to work on weekends, holidays, and after hours.

478. Based on the number of hours worked by PLAINTIFF, abroad and in the U.S., PLAINTIFF was paid less than minimum wage.

479. DEFENDANTS also failed to keep adequate records or document the time that PLAINTIFF worked, her overtime hours, after-hours work, holiday work, etc.

480. DEFENDANTS did not pay PLAINTIFF any compensation for her hours worked at either a regular rate of pay or with any overtime premium for those weeks that led her to work more than forty hours per week.

481. Throughout her employment, PLAINTIFF was not required to use any kind of clock-in or clock-out mechanism.

482. PLAINTIFF complained to DEFENDANTS concerning her missing hours. She never received any response and, as of the date of this Complaint, remains unpaid for many hours worked for DEFENDANTS, USALFH or RCGEG.

483. When PLAINTIFF complained about her pay, often, she was cut-off therefrom in retaliation for complaining.

484. PLAINTIFF regularly handled goods and services in interstate and international commerce, on behalf of her employers, DEFENDANTS, USALFH and RCGEG.

485. As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future

pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

486. COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

487. PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

488. PLAINTIFF has been damaged in an amount to be determined at trial.

<b>AS A FIFTEENTH CAUSE OF ACTION<br>FOR VIOLATION OF NOTICE AND RECORDKEEPING REQUIREMENTS OF THE<br>NYLL</b>

489. PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

490. DEFENDANTS failed to provide PLAINTIFF with a written notice, in English (PLAINTIFF'S primary language), of her rate of pay, regular payday, and such other employment information as required by NYLL §195(1).

491. DEFENDANTS failed to keep records of the hours worked by PLAINTIFF, overtime hours, differentials, expenses, reimbursement required, and other records related to taxes and tax reporting.

492. Despite PLAINTIFF'S numerous requests, DEFENDANT failed to provide her with proof of employment and employment compensation.

493. Despite her requests, DEFENDANTS failed to provide PLAINTIFF with end-of-year statements and tax documentation.

494. As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation

expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

495. COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

496. PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

497. PLAINTIFF has been damaged in an amount to be determined at trial.

## AS A SIXTEENTH CAUSE OF ACTION
## FOR VIOLATION OF THE WAGE STATEMENT PROVISIONS OF THE NYLL

498. PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

499. DEFENDANTS have not provided PLAINTIFF with wage statements upon each payment of wages, as required by NYLL 195(3).

500. DEFENDANTS failed to keep records of the hours worked by PLAINTIFF, overtime hours, differentials, expenses, reimbursement required, and other records related to taxes and tax reporting.

501. Despite PLAINTIFF'S numerous requests, DEFENDANT failed to provide her with proof of employment and employment compensation.

502. Despite her requests, DEFENDANTS failed to provide PLAINTIFF with end-of-year statements and tax documentation.

503. As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation

expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

504. COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

505. PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

506. PLAINTIFF has been damaged in an amount to be determined at trial.

<b>AS A SEVENTEENTH CAUSE OF ACTION<br>BREACH OF CONTRACT / BREACH OF IMPLIED CONTRACT</b>

507. PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

508. At the time of her hire, and at numerous points thereafter, PLAINTIFF was offered a salary that matched or exceeded her former salary, medical benefits, company vehicle, steady pay/compensation.

509. PLAINTIFF accepted DEFENDANTS' offer and agreed to, and did, begin working for DEFENDANTS in exchange for said promises.

510. When DEFENDANTS asked PLAINTIFF to go to Grenada, DEFENDANTS offered PLAINTIFF adequate pay, steady payments, bonuses, additional compensation, relocation fees/costs, rent reimbursement and/or payment, remote support, childcare assistance, and other terms and conditions.

511. After much coaxing and persuasion and offers, PLAINTIFF accepted DEFENDANTS' offer to and did, go to Grenada to represent CORPORATE DEFENDANTS in exchange for said promises.

512. DEFENDANTS also promised to codify the above agreements in writing, but never provided PLAINTIFF with said written documents despite PLAINTIFF'S repeated requests for same and although PLAINTIFF began to perform her obligations.

513. PLAINTIFF continued to perform her obligations as per the agreement.

514. DEFENDANTS did not perform their promises under the agreement and/or did not fully fulfill their obligations.

515. DEFENDANTS breach their agreement and promises (actual and implied) with PLAINTIFF.

516. DEFENDANTS' breach was intentional, malicious, in bad faith, and designed to cause PLAINTIFF financial and emotional harm.

517. PLAINTIFF was caused actual harm by DEFENDANTS' breach described above.

518. As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

519. COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

520. PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

521. PLAINTIFF has been damaged in an amount to be determined at trial.

### AS AN EIGHTEENTH CAUSE OF ACTION
### FRAUD / FRAUDULENT INDUCEMENT

522.  PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

523.  DEFENDANT TSIMBLER asked PLAINTIFF to travel abroad to Grenada on behalf of the CORPORATE DEFENDANTS and PLAINTIFF declined the request.

524.  DEFENDANT TSIMBLER stated, and promised, that PLAINTIFF would be properly compensated; that DEFENDANTS would fully cover her business-related costs/expenses; that DEFENDANTS would give her adequate support for herself and her child; and other promises alleged above.

525.  DEFENDANT TSIMBLER knew at the time that the promises were made, that he was not going to fully perform his promises to PLAINTIFF.

526.  DEFENDANT TSIMBLER knew that he would continue the same behavior and violations of PLAINTIFF'S rights that he started while PLAINTIFF was in New York.

527.  DEFENDANT TSIMBLER caused PLAINTIFF to act, to uproot herself and her child, and move to Grenada solely for DEFENDANTS' business purposes.

528.  PLAINTIFF relocated to Grenada based upon reasonable reliance on the promises and terms and conditions of DEFENDANT TSIMBLER.

529.  DEFENDANTS did not pay or compensate PLAINTIFF as promised for her relocation to Grenada and created severe financial hardship for PLAINTIFF.

530.  As a direct result of her actions, taken in reliance upon the promises of DEFENDANT TSIMBLER, PLAINTIFF was injured and caused to suffer damages, which were foreseeable to DEFENDANTS.

531.  As a direct result of the acts and conduct complained of herein, PLAINTIFF has suffered loss of income/wages/etc., loss of employment, loss of employment opportunities, injuries to her children and family, inconvenience, severe financial hardship, travel and relocation

expenses, fraudulent inducement, special damages, loss of employment benefits and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, medical injuries, physical pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

532.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

533.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

534.   PLAINTIFF has been damaged in an amount to be determined at trial.

## PUNITIVE DAMAGES ARE APPROPRIATE

535.   Punitive damages are appropriate against COLLECTIVE DEFENDANTS because their actions were willful, malicious, and committed with reckless disregard for the rights of PLAINTIFF.

## JURY DEMAND

536.   PLAINTIFF requests a jury trial on all issues to be tried.

**WHEREFORE**, PLAINTIFF respectfully requests a judgment against COLLECTIVE DEFENDANTS:

A.   Declaring that COLLECTIVE DEFENDANTS engaged in unlawful employment practices prohibited by Title VII, NYSHRL, and NYCHRL in that COLLECTIVE DEFENDANTS discriminated against PLAINTIFF on the basis of her sex/gender, race/color, and national origin.

B.   Compelling COLLECTIVE DEFENDANTS to provide PLAINTIFF with employment documents, proof of employment, pay stubs and proof of pay, and all other documents to which PLAINTIFF is entitled under law;

C.     For damages consistent with the mandates of the FLSA and NYLL;

D.     Awarding damages to PLAINTIFF for all lost wages and benefits resulting from COLLECTIVE DEFENDANTS' unlawful discrimination and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

E.     Awarding PLAINTIFF compensatory damages for mental, emotional, and physical injury, distress, pain and suffering, and injury to her reputation in an amount to be proven;

F.     Awarding PLAINTIFF punitive damages;

G.     Awarding PLAINTIFF attorneys' fees, costs, and expenses incurred in the prosecution of the action pursuant to 42 U.S.C. §1988 and as afforded under the above local statutes; and

H.     Awarding PLAINTIFF such other and further relief as the Court may deem equitable, just, and proper to remedy COLLECTIVE DEFENDANTS' unlawful employment practices.

Dated: New York, New York
        November 17, 2020

**PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC**

**/S/**

By:     _____
        Gregory Calliste, Jr., Esq.
        Yusha Hiraman, Esq.
        *Attorneys for Plaintiff*
        45 Broadway, Suite 430
        New York, New York 10006
        T: (212) 248 - 7431
        F: (212) 901 - 2107
        gcalliste@tpglaws.com
        yhiraman@tpglaws.com