UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
KATHYANN SMART,

                Plaintiff,

      -against-

USA LABOR FOR HIRE, INC., RC
GLOBAL ENERGY GROUP, INC., and
OLEG TSIMBLER,

              Defendants.
-----------------------------------------------------------X

**MEMORANDUM
AND ORDER**
20-CV-5594 (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

      Following a jury trial where Defendants USA Labor for Hire, Inc., RC Global

Energy Group, Inc., and Oleg Tsimbler were found liable for violations of Title VII of

the Civil Rights Act of 1964, the New York City Human Rights Law, the City of New

York Administrative Code, and New York common law, Defendants filed a motion

seeking a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59 or, in the

alterative, remittitur. (Notice of Defs.' Post Trial Mots., ECF No. 51; Mem. of Law in

Supp. of Defs.' Post Trial Mots., ECF No. 51-1 (hereinafter "New Trial Mem.").)

Plaintiffs filed a motion seeking attorneys' fees, costs, and pre- and post-judgment

interest. (Notice of Mot. for Reasonable Att'ys' Fees, Expenses, & Costs, ECF No. 52;

Pl.'s Mot. for Att'ys' Fees & Costs, ECF No. 54 (hereinafter "Fees Mot.").)

      For the reasons set forth below, Defendants' motion for a new trial or, in the

alternative, remittitur, is denied, and Plaintiff's motion for attorneys' fees, costs, and

pre- and post-judgment interest is granted.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Kathyann Smart initiated this action against Defendants USA Labor for Hire, Inc. ("USALFH"), RC Global Energy Group, Inc. ("RC Global"), and Oleg Tsimbler (collectively "Defendants") on November 17, 2020. (Compl., ECF No. 1.) In the complaint, Plaintiff alleged, *inter alia*, claims for discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* and § 1981 *et seq.*; the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*; the New York State Human Rights Law ("NYSHRL"), New York State Executive Law section 296 *et seq.*; the New York City Human Rights Law ("NYCHRL"), the City of New York Administrative Code section 8-107 *et seq.*; the New York Labor Law, Art. 6 section 190 *et seq.* and Art. 19 section 650 *et seq.*; as well as claims alleging breach of contract, fraud, and defamation. (*See id.* ¶¶ 1–3; *id.* at 35–69.)

On January 16, 2024, the case proceeded to trial on Plaintiff's Title VII and NYCHRL hostile work environment, discriminatory termination, and retaliation claims, and Plaintiff's New York common law defamation claim. (Jan. 16, 2024 ECF Min. Entry; Verdict Form, ECF No. 50.)

### I.  The Evidence at Trial[1]

During the trial, Plaintiff introduced evidence that she began her employment with Defendants in October of 2017 and was terminated in January of 2020. (Tr. at 114:7–9, 136:8–12.) Plaintiff testified that, at the time of hire, she was under the

---

[1] The Court notes that the parties cite to portions of the trial transcript appended to their briefs as exhibits. (*See* Pl.'s Direct Test., ECF No. 51-2; Pl.'s Cross Exam., ECF No. 51-5; Pl.'s Continued Cross Exam., ECF No. 51-6; Trial Tr., ECF No. 55-1.) However, the Court cites to the official trial transcripts docketed at ECF Nos. 57, 58, and 59. The official transcript is referred to herein as "Tr."

impression that she would be working as a manager in a hotel. (*Id.* at 34:20–36:12.) Plaintiff testified, however, that about a year after she started working for Defendant Tsimbler, he asked her to go to Grenada to manage a bar, restaurant, and farm. (*Id.* at 53:10–16.) At the beginning, she was just "traveling back and forth to Grenada," but eventually she moved there, in November 2019. (*Id.* at 53:19–20, 83:7–84:5.) Plaintiff explained that Defendants USALFH and Tsimbler provided her with moving expenses and that Tsimbler had promised to pay for her son's school and other expenses while she was working there. (*Id.* at 163:25–164:14, 171:7–13.)

The trial evidence established that Defendants USALFH and RC Global (collectively the "Corporate Defendants") employed Plaintiff together with Defendant Tsimbler. Specifically, Defendant RC Global is listed as the "payer" on Plaintiff's 2018 1099 tax form, and Defendant USALFH is listed as the "payer" on Plaintiff's 2019 1099 tax form. (Def. Ex. 2.) Plaintiff testified that it was her understanding that she was hired to work for Defendant USALFH, and "the only time I was made aware of RC Global was when I received, you know, a check that said RC Global." (Tr. at 50:14–16.) When she asked the accountant of USALFH about RC Global, the accountant said it was part of the company. (*Id.* at 50:16–19.) In addition, Defendant Tsimbler testified that, prior to the pandemic, he was a general manager of both USALFH and RC Global. (*Id.* at 212:1–4; 223:7–8, 220:22–25, 222:9–17.) When asked whether there were any differences between the work of USALFH and RC Global, Defendant Tsimbler testified, "[n]o, it's the same." (*Id.* at 221:6–9.)

The parties also introduced evidence concerning Plaintiff's pay. Specifically, Plaintiff testified that she was promised a salary of "about $85,000 [per] year," a 401k, and health insurance. (*See id.* at 35:2–7.) Plaintiff stated that the first check she received was for $500, and when she spoke with Defendant Tsimbler about this, he said "just be

patient with me and what I promise you is going to happen." (*Id.* at 37:4–11.) Plaintiff further testified that she never received health insurance or any benefits, and that when she confronted Defendant Tsimbler about this, he told her "I never promised you that and you should apply for the state insurance." (*Id.* at 37:16–23.) Plaintiff also testified that in 2019, her weekly pay increased to approximately $700. (*Id.* at 43:13–15.) Sometimes, however, she was paid $450 or less, because "that's what [Defendants] had that week to pay [her]." (*Id.* at 49:14–18.) When Plaintiff spoke to the accountant when she did not receive her weekly paycheck, the accountant would explain that "[they] barely made money to pay [their] workers," and after Plaintiff talked to Defendant Tsimbler, eventually the accountant "would send something to the account." (*Id.* at 49:20–24.) Plaintiff testified that she experienced this every month, and her rate of pay never increased beyond $700 a week. (*Id.* at 49:25–50:6.) The documentary evidence established that in 2018, Defendant RC Global paid Plaintiff $24,044.12, and in 2019, Defendant USALFH paid Plaintiff $28,000. (Def. Ex. 2.) Plaintiff testified that she was paid through her PayPal account, and her 2019 PayPal records reflect that she was paid $19,071.09[2] in 2019. (Tr. at 50:25–51:11; Pl. Ex. K.)

Plaintiff also presented evidence of how Defendant Tsimbler treated her. Plaintiff testified that Defendant Tsimbler referenced her race and national origin, repeatedly calling her, or even introducing her as, "sexy black Katya, exotic Katya, [and] Grenadian black princess." (*See* Tr. at 141:12–14.) Plaintiff also testified that Defendant Tsimbler called her "cyka," and "vlat cyka," which she understood to mean "bitch" and "fucking bitch" in Ukrainian, respectively. (*See, e.g.*, *id.* at 39:13–19, 41:7–11.) In addition,

---

[2] Calculated as the sum of all items labeled "General Payment: Natalya Gritzayuk" in Plaintiff's Exhibit K.

4

he would yell at her "on the phone, screaming, saying that I don't have a brain, that I didn't graduate from kindergarten, that . . . I'm a baby and I have a brain of a baby, that I can't think on my own. This was constantly, every single day." (*Id.* at 61:22–62:1.) Further, Plaintiff testified that Defendant Tsimbler once told a police officer that Plaintiff "runs around in Grenada in a car with a man. That's all she did in Grenada, that's what I'm paying her for, you know, to run around and act like way slut in a car and sleeping with men in a car." (*Id.* at 93:16–24.) Plaintiff also produced evidence that Defendant Tsimbler made comments about her neighborhood, referring to it as a "ghetto," as well as comments about "black people" who "just buy fancy cars but can't pay their bills and can't buy a house." (*Id.* at 52:15–53:4.)

Plaintiff also introduced a lengthy text message chain between her and Defendant Tsimbler that corroborated her testimony regarding how Tsimbler treated her.[3] (*See* Pl. Ex. L; Tr. at 70 (introducing exhibit).) For example, the text messages

---

[3] With regard to this exhibit, the Court provided a limiting instruction at the time it was introduced, as follows:

> I would note for the jurors that Exhibit L contains text communications and unless otherwise indicated by me later, the text communications admitted into evidence in Exhibit L may be considered by you only on the question of determining the nature of any employment relationship between the parties.

> Specifically, the jury may consider whether these communications reflect an employer-employee relationship or an independent contractor relationship. The exhibit, Exhibit L, may not be used or considered for any other purpose. The jury may not, for example, rely on the text messages to determine the truth of any of the statements contained in the messages themselves. The messages are essentially being offered for the purpose of proving that they were stated, but not for the truth.

(Tr. at 70:11–25.)

included messages from Defendant Tsimbler in which he referred to her as "Syka,"[4] (Pl. Ex. L., at Bates pp. 1131, 1169, 1185) and he once texted her: "Don't be Syka!!!" (*id.*, at Bates p. 889). (*See also* Tr. at 72:7–10 (Plaintiff's testimony regarding the "Don't be Syka!!!" text), 244:15–245:4 (Defendant Tsimbler's testimony regarding this same text).) The text messages also demonstrated frequent communications between Plaintiff and Defendant Tsimbler over the time period from September 18, 2018, through early February 2020. (Pl. Ex. L.)

Plaintiff's employment with Defendant Tsimbler and his companies came to an end while Plaintiff was in Grenada in 2019. (*See* Tr. at 88–92.) At trial, Plaintiff testified that Defendant Tsimbler fired her while she was in Grenada and told her that he would not provide any money for her to move back to the United States. (*See id.* at 89:12–20.) Plaintiff further testified that after firing her, Defendant Tsimbler told her:

> You're not getting one cent from me. I'm not paying your salary. And I don't care if you and your son end up as beggars on street in Grenada. You will not get one cent. I'm not paying the rent. I'm not paying the lights. I don't care if the lights go off on you, I don't care. You could end up begging on the streets in Grenada. That's your business. I don't care.

(*Id.* at 91:21–92:2.)

Plaintiff and another witness, Plaintiff's sister, testified about the effect of Defendant Tsimbler's actions on Plaintiff. Specifically, Plaintiff testified that she felt "insulted" by Tsimbler's statements, that she felt exploited by him, and that he would call her a failure. (*Id.* at 52:9–53:6, 58:3–7, 57:9–13.) Plaintiff further testified that she felt other employees disrespected her because "they heard how Oleg Tsimbler would speak

---

[4] The exhibit indicates that the text messages are from a contact named "George Twin," whereas earlier text messages are from a different phone number with a contact named "Oleg Tsimbler." (*Compare* Pl. Ex. L., at Bates p. 1131, *with id.* at Bates p. 889.) Plaintiff testified that the number labeled "George Twin" was Oleg Tsimbler. (Tr. at 75:16–21.)

to me . . . and how he would just chastise me every single minute that he got, . . . I got no respect from them. They didn't feel they had to respect me." (*Id.* at 62:16–22.) Plaintiff even testified that on one occasion, Defendant Tsimbler "started berating me on the phone, on speaker . . . with the employees there. And I could see [the employees] laughing and smirking." (*Id.* at 63:7–9.) Plaintiff further testified that one time, she went to speak to another employee, Jerome, and that he

> basically attacked me and tried to punch me in my face. And someone had to like grab him to keep him away from me. And that is because the constant, many times that Jerome has heard Oleg talk to me, he didn't feel he has to respect me, called me a bitch, just like Oleg would call me a bitch.

(*Id.* at 63:18–24.) Plaintiff also testified that he treated her differently than the other employees. For example, Plaintiff testified that Defendant Tsimbler "would just chastise me every single minute that he got," and that "[h]e didn't speak to any of the other men workers that I worked with . . . that way." (*Id.* at 62:19–25.)

Plaintiff's sister, Rachel Drakes ("Drakes") also testified about changes in Plaintiff's emotional and physical state. Drakes testified that, "over time, I could tell [Plaintiff] wasn't so happy. . . . There came a point where I noticed it was consistently, like, stressed out . . . ." (*Id.* at 294:14–18.) Drakes also testified that Plaintiff lost a significant amount of weight, distanced herself from family, and that the job was "taking its toll on her." (*Id.* at 295:6–10, 296:9–17.) Drakes further testified that after Plaintiff was terminated, she was "sad" and "hurt by the way things went down," and that "it took her a long time to get over what happened and the way he treated her. You could tell she was sort of not herself. . . . She just wasn't in a good place for a while . . . [and] it took her a long time to get herself back together." (*Id.* at 299:5–23.)

7

## II.   Relevant Jury Instructions at Trial

After the jury was sworn in, the Court instructed the jurors regarding their roles and duties and provided preliminary instructions. (*Id*. at 5:19–18:19.) During the preliminary instructions, the Court told the jury, *inter alia*, that "[s]tatements, arguments, and questions by lawyers are not evidence." (*Id*. at 8:8–12; *see id.* at 16:14–16.) The Court also instructed the jury that "[i]f you are instructed that some item of evidence is being received for a limited purpose only, you must follow that instruction." (*Id.* at 9:3–5.) As the trial proceeded, the Court repeatedly provided a limiting instruction regarding how the jurors were to consider Plaintiff's testimony regarding her understanding of Defendant Tsimbler's use of Ukrainian words. For example, when Ms. Smart first testified regarding her understanding of the word "cyka," the Court instructed the jury as follows:

> I instruct the jury that Ms. Smart's testimony on this topic is being admitted for the fact that the statement was said and her understanding of it, but it is not offered for the truth of the fact of what it means in Ukrainian, as she does not speak Ukrainian.

(*Id.* at 40:21–25; *see also id.* 41:15–18, 68:24–69:3.)

The Court also provided final instructions to the jury prior to deliberations. (*Id.* at 366:24–404:9.) In the final charge, the Court reiterated that "for any question concerning the facts, it is [the jury's] recollection of the facts that controls. It is not counsel's recollection, as expressed in the opening statements or closing arguments" that controls. (*Id.* at 367:19–23.) In addition, the Court re-instructed the jury that "[i]f certain testimony or evidence was received for a limited purpose, you must follow the limiting instructions that I have given." (*Id.* at 372:6–9.) Additionally, the Court advised the jury that "[e]ach party is entitled to use all of the evidence introduced at the trial," and that "[n]o significance should be attached to the fact that a document was

8

introduced by one party rather than by the other," because "[a]ny party is entitled to the benefit of any evidence, even when that evidence is from witnesses or documents introduced by another party." (*Id.* at 372:10–16.) The Court also instructed the jury on the elements of the claims and relevant legal standards. (*Id.* at 377:7–399:8.)

As part of the substantive instructions, the Court instructed the jury about how to determine whether an individual is an independent contractor or an employee, and listed the factors the jury should consider in making this determination. (*Id.* at 391:9–392:15.)

Lastly, the Court instructed the jury regarding damages. As to how the Court instructed the jury on how to determine Plaintiff's actual damages, the Court stated as follows:

> First, you may decide to award her actual damages from one or more defendants. Meaning, an amount of money that compensates her for any economic losses she suffered as a result of that defendant's discrimination, retaliation and/or defamation. The key words here are, "as a result of". You may award actual damages only for injuries that plaintiff proves were substantially caused by the discrimination, retaliation, and/or defamation of the defendant you are considering. Your goal with regard to actual damages is to make the plaintiff whole. Thus, your calculation of actual damages must be fair and reasonable and must be neither inadequate, nor excessive. Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork. You should not award damages for speculative injuries, but only those injuries the plaintiff has actually suffered or which she is reasonably likely to suffer in the future.

(Tr. at 395:11–396:3). The Court also instructed the jury that they should award "nominal damages if you conclude that the only injury the plaintiff suffered was the deprivation of her rights under the discrimination, retaliation, and/or defamation laws, without any economic harm as a natural consequence of that deprivation." (*Id.* at 396:18–23.) Neither party objected to any instruction given.

9

### III.  Verdict and Post-Trial Motions

On January 18, 2024, the jury returned a verdict in Plaintiff's favor, finding the Corporate Defendants liable for creating a hostile work environment on the basis of sex, gender, race, and color in violation of Title VII and the NYCHRL, and for retaliation in violation of Title VII and the NYCHRL. (Verdict Form, ECF No. 50, at 1–2, 4–5.) The jury did not find Defendants liable for any claims on the basis of national origin. (*Id.*) The jury also found Defendant Tsimbler liable for creating a hostile work environment on the basis of sex, gender, race, and color in violation of the NYCHRL and for retaliation in violation of the NYCHRL, and for defamation in violation of the New York common law. (*Id.* at 2, 5.) The jury awarded Plaintiff a total of $260,000, which included: (1) actual damages[5] of $150,000; (2) compensatory damages of $60,000; and (3) punitive damages of $50,000. (*Id.* at 5–7.)

### A.  Defendants' Motion for New Trial or Remittitur

On January 31, 2024, Defendants filed a motion seeking a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59 or, in the alterative, remittitur. (Notice of Defs.' Post Trial Mots., ECF No. 51; New Trial Mem., ECF No. 51-1.) Plaintiff filed a response in opposition on February 16, 2024. (Mem. in Opp'n, ECF No. 55.) To date, Defendants have not filed a reply. For the reasons set forth below, Defendants' motion for a new trial or remittitur in the alternative is denied.

---

[5] Defendants' motion and the Verdict Form refer to these damages as "Lost Wages." (New Trial Mem., ECF No. 51-1, at 4; Verdict Form, ECF No. 50, at 5). However, the Court's jury charge instructed the jurors on actual damages, in order to compensate Plaintiff "for any economic losses she suffered as a result of . . . [D]efendant[s'] discrimination, retaliation[,] and/or defamation." (Tr. at 395:12–16.) For the reasons discussed herein, the Court finds that the jury had a sufficient basis to determine Plaintiff's actual damages that resulted from the hostile work environment and retaliatory termination. Accordingly, the Court refers to these damages as "actual damages."

**B. Plaintiff's Motion for Attorneys' Fees, Interest, and Costs**

On February 2, 2024, Plaintiff filed a motion seeking attorneys' fees, costs, and pre- and post-judgment interest. (Fees Mot., ECF No. 54; *see* Decl. of Steven Fingerhut, ECF No. 53 (hereinafter "Fingerhut Decl.").) Plaintiff filed a supplemental declaration on May 10, 2024, to include "the hours expended to complete Plaintiff's motion for attorney's fees as well as Plaintiff's opposition to Defendants' motion for a new trial." (Suppl. Decl. of Steven Fingerhut, ECF No. 60, at 1 (hereinafter "Fingerhut Suppl. Decl.").) Plaintiff's counsel requests a total of $172,580 in fees, which reflects a total of 569.6 hours worked by eight attorneys.[6] (*See* Fees Mot., ECF No. 54, at 15, 17 (requesting $143,785 for 460 hours worked); Fingerhut Suppl. Decl., ECF No. 60 (supplementing the Fees Motion to request an additional $28,795 in fees for 109.6 hours worked); Billing Records, ECF No. 56; Suppl. Billing Records, ECF No. 60-1.) Counsel also seeks reimbursement for costs in the amount of $5,318.80. (Fees Mot., ECF No. 54, at 17; Fingerhut Decl., ECF No. 53, ¶ 57.) Accordingly, counsel seeks a grand total of $177,898.80 in fees and costs. (Fingerhut Suppl. Decl., ECF No. 60, ¶ 35.) In addition, counsel seeks pre-judgment interest in the amount of $3,942, as well as post-judgment interest. (Fees Mot., ECF No. 54, at 17–18.) To date, Defendants have not filed a response. For the reasons discussed below, Plaintiff's motion for attorneys' fees, costs, and pre- and post-judgment interest is granted.

---

[6] As detailed further in note 15, there are discrepancies between Plaintiff's counsel's request and the underlying billing records.

## DISCUSSION

### I.  Defendants' Motion for New Trial or Remittitur

#### A.  Federal Rule of Civil Procedure 50(b)

##### 1.  *Legal Standards*

Under Federal Rule of Civil Procedure 50(a), a party may move for judgment as a matter of law "at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). Under Federal Rule of Civil Procedure 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Accordingly, "[n]o later than 28 days after the entry of judgment," "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." *Id*.

##### 2.  *Analysis*

Here, Defendants moved for a new trial under Federal Rule of Civil Procedure 50(b). However, Defendants did not move for judgment as a matter of law before the case was submitted to the jury pursuant to Rule 50(a)(2). The Rule 50(b) motion for a new trial is denied.[7] Fed. R. Civ. P. 50(b); *Mealey v. Apartment Rentals*, No. 96-9025, 1997 WL 592831, at *2 (2d Cir. Sept. 24, 1997) (declining to "waive the procedural

---

[7] The Court notes that "[w]here a jury's verdict is wholly without legal support," courts may "order a new trial in order to prevent a manifest injustice," even if the movant "did not move for [judgment as a matter of law] pursuant to Rule 50(a) of the Federal Rules of Civil Procedure." *Sojak v. Hudson Waterways Corp.*, 590 F.2d 53, 54–55 (2d Cir. 1978); *see Baskin v. Hawley*, 807 F.2d 1120, 1130 (2d Cir. 1986) (explaining that relief from the requirement that the movant first move for a judgment as a matter of law under Rule 50(a) "is only available to prevent a manifest injustice" (quotation marks omitted)). However, as demonstrated below, "no manifest injustice will result from denying the motion because there is no substantive merit to the motion in any event." *Rao v. N.Y.C. Health & Hosps. Corp.*, 905 F. Supp. 1236, 1246 (S.D.N.Y. 1995).

requirement that a Rule 50(a) motion is a prerequisite to a Rule 50(b) motion" when the plaintiffs "did not move for judgment as a matter of law prior to submitting the case to the jury"); *Pouncy v. Danka Off. Imaging Co.*, No. 06-CV-4777 (RPP), 2009 WL 3415142, at *1 (S.D.N.Y. Oct. 22, 2009) ("Since Plaintiff did not move for judgment as a matter of law under Rule 50(a) prior to the submission of his case, the Federal Rules of Civil Procedure do not permit Plaintiff to 'renew' his motion under Rule 50(b). Accordingly, that motion is denied." (citation omitted)); *see* Fed. R. Civ. P. 50 advisory committee's note to 2006 amendment ("Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion.").

## B. Federal Rule of Civil Procedure 59

### 1. *Legal Standards*

Under Federal Rule of Civil Procedure 59, "[t]he court may, on motion, grant a new trial on all or some of the issues" "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). "[F]or a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (alterations in original) (quotation marks omitted); *see DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (same); *Song v. Ives Lab'ys, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (same). When considering a Rule 59 motion for a new trial, a trial judge "is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." *Song*, 957 F.2d at 1047 (quotation marks omitted). It is well established that "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing

a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Ojeda v. Metro. Transp. Auth.*, 477 F. Supp. 3d 65, 76 (S.D.N.Y 2020) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)).

    2. *Analysis*

Defendants make six arguments in support of their motion for a new trial: (1) "the verdict was based on inadmissible hearsay and unreliable translation by the Plaintiff of foreign language terms, which caused substantial prejudice to the Defendants"; (2) "opening [and] closing statements by Counsel for Plaintiff contained false statements on which not a single piece of evidence was provided"; (3) "the evidence does not support a verdict of $50,000 in lost wages from each of the three Defendants"; (4) "the evidence does not support a finding of emotional distress, and the evidence does not support the damages awarded for such or punitive damages"; (5) "the evidence is insufficient for a finding of defamation and any damages"; and (6) "the evidence does not support the finding that Plaintiff was a regular employee and not an independent contractor." (New Trial Mem., ECF No. 51-1, at 1, 4, 6, 7 (capitalization modified).) For the reasons set forth below, Defendants' Rule 59 motion for a new trial is denied.

    a. <u>Improperly Admitted Evidence</u>

Defendants' first argument is based on the admission of foreign language terms. Defendants argue that "Ms. Smart[] did not specify the source of the translation that 'cyka' meant 'bitch' and did not provide any indication that she was qualified to speak to its contextual meaning or any meaning." (New Trial Mem., ECF No. 51-1, at 1–2.) Defendants argue this is "inadmissible hearsay"; accordingly, "the evidence does not support a hostile work[] environment" because "[i]t appears this [inadmissible hearsay] is solely what the jury focused on." (*Id.* at 1–3.)

First, the Court finds that Plaintiff's testimony regarding the word "cyka" was not hearsay. Under Federal Rule of Evidence 801, hearsay is a statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). Plaintiff's testimony regarding the word "cyka" was not hearsay because it was not offered for the truth of what the word means. (*See, e.g.*, Tr. at 39:24– 40:9 (allowing testimony about "cyka" "for the fact that it was said").) Moreover, the Court provided limiting instructions, instructing the jury that "Ms. Smart's testimony on this topic is being admitted for the fact that the statement was said and her understanding of it, but it is not offered for the truth of the fact of what [cyka] means in Ukrainian, as she does not speak Ukrainian." (*Id.* at 40:21–25.) The Court provided a similar instruction as to the phrase "vlat cyka," which translation Defendants also contend was inadmissible and erroneous. (*Id.* at 41:15–18 ("Again, Ms. Smart's understanding of what the Ukrainian words may or may not have meant are not offered for the fact that that is what they mean in Ukrainian, but it is only permissible as to her understanding of what it meant.").) It is well established that "juries are presumed to follow [limiting] instructions." *Tesser v. Bd. of Educ.*, 190 F. Supp. 2d 430, 442 (E.D.N.Y. 2002) (quoting *Zafiro v. United States*, 506 U.S. 534, 540 (1993)); *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002).[8]

---

[8] Although not ultimately relevant to the Court's analysis as to whether the jury was exposed to inadmissible hearsay, the Court notes that Plaintiff's understanding of the meanings of these Ukrainian words was not incorrect. Although curse words do not always translate exactly into foreign languages, the word "cyka" is commonly translated to mean "bitch." *See Cyka Blyat*, Dictionary.com (Aug. 1, 2018), https://www.dictionary.com/e/translations/cyka-blyat/. Similarly, "vlat" or "blyat" — a transliteration of the word "блять" in Ukrainian — is a common profanity that can be translated in the manner Ms. Smart understood. *Id.*

For these reasons, the Court finds that the verdict was not based on inadmissible hearsay and, in any event, "any potential prejudice was sufficiently cured" by the limiting instructions "and the admission of [the testimony] did not create substantial prejudice." *Tesser*, 190 F. Supp. 2d at 442; *see Lewis v. Am. Sugar Refin., Inc.*, 325 F. Supp. 3d 321, 337 (S.D.N.Y. 2018). Here, "the Court is confident that the jury did not reach a seriously erroneous verdict" due to the admission of testimony regarding Plaintiff's understanding of the meaning of "cyka" and "vlat." *Ojeda*, 477 F. Supp. 3d at 78 (quotation marks omitted). Defendants' motion for a new trial on this ground is denied.[9]

> b. <u>Plaintiff's Opening and Closing Statements</u>

Defendants' second argument is based on Plaintiff's opening and closing statements, which Defendants argue "contained false statements on which not a single piece of evidence was provided." (New Trial Mem., ECF No. 51-1, at 4.) Specifically, Defendants allege that "[t]here were references made to the exploitation of labor[ and] exploiting Grenadian people," but "not a single piece of evidence was presented as to this." (*Id*.) Accordingly, Defendants argue that "such statements, without any evidence, . . . have a tendency to inflame the jury to the detriment of the Defendants." (*Id*.)

The Court first notes that Plaintiff's counsel used the word "exploited" once during each of his jury addresses, both times to argue that *Plaintiff* had been exploited.

---

[9] Defendants further argue that "if the jury [did] not hear this inadmissible and erroneous translation, there is no basis to find any liability" for a hostile work environment. (New Trial Mem., ECF No. 51-1, at 2.) This argument is belied by the evidence, detailed above, regarding Tsimbler's treatment of Plaintiff, his comments regarding her race and neighborhood, and other derogatory comments.

(*See* Tr. at 19:22–20:11, 348:19–349:4.) Defense counsel made no contemporaneous objections during either Plaintiff's opening or closing statements. (*Id.*) Moreover, Plaintiff testified regarding feeling exploited by Defendant Tsimbler. When asked "[w]hat's your understanding of the reason that you were tasked with all of these business ideas to work on in Grenada?", Plaintiff responded:

> I think -- well, one, I think just for me -- eventually it's like an exploitation of myself . . . . You know, in regards to Oleg Tsimbler in Grenada and having these projects or working on these projects, he wanted to be savior. He wanted to be this white savior for the Grenadians. He didn't say it once or twice. He often said that, that he was basically their savior. So that's why he had me there.

(*Id.* at 58:5–16.) The Court also notes that there was some evidence presented regarding plans to utilize Grenadian labor. Specifically, Plaintiff testified that Defendant Tsimbler "wanted to have workers from Grenada go to Bahrain and work," and when asked why, Plaintiff stated, "[w]ell, I mean, it's cheaper to have employees over there, I guess, you know, pay employees, I don't know. I mean, it was just this is where he wanted me to go. Whatever Oleg [Tsimbler] kind of told me to do, I was working for him, I was his employee." (*Id.* at 64:8–15.)

Even if Plaintiff had not presented any evidence to support the brief comments by Plaintiff's counsel regarding exploitation, there would still be no basis for a new trial. As the Second Circuit has observed:

> Trial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial. Not every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted.

*Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir. 1989); *see also FIH, LLC v. Barr*, No. 20-489, 2021 WL 5286659, at *5 (2d Cir. Nov. 15, 2021) (summary order). Here, as noted above, defense counsel failed to make any contemporaneous objection to

Plaintiff's counsel's remarks — perhaps because, in context, they were unobjectionable. (*See* Tr. at 64.) In addition, as detailed above, the Court provided both preliminary and final instructions in which the Court instructed the jury that statements made by lawyers are not evidence. (*Id.* at 8:8–12, 367:19–23.) The statements here were not so inflammatory that they irreparably tainted the proceedings or "created undue prejudice or passion" that played upon the sympathies of the jury. *Matthews*, 871 F.2d at 278.

Moreover, "[i]n a civil case such as this, speculation by [Plaintiff's] counsel . . . does not threaten to impermissibly shift the burden of proof as it would in a criminal case in which the prosecution makes unfounded speculative arguments about a defendant's guilt." *Tesser*, 190 F. Supp. 2d at 443. "Here, defendants were free to argue that Plaintiff had not met her burden and to question the sufficiency of her evidence." *Id.* Therefore, the Court finds that

> any potential prejudice resulting from statements by [Plaintiff's] counsel . . . was adequately cured by the instructions to the jury, and in any case, in light of all the other evidence, such statements could not be considered so substantially prejudicial as to 'in some material respect' have 'swayed' the factfinder's judgment.

*Id.* (citing *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997)). Accordingly, Defendants' motion for a new trial on this basis is denied.

### c. Actual Damages

Defendants argue that "[t]he evidence does not support a verdict of $50,000 in lost wages from each of the three Defendants." (New Trial Mem., ECF No. 51-1, at 4.) Specifically, Defendants argue that because "Plaintiff failed to produce a single tax return that would show her earnings," and because it is Plaintiff's burden to establish her own loss of actual past earnings, "there was no basis for the jury to award an identical sum of $50,000 from each of the three Defendants." (*Id.* at 4–5.)

To recover damages, plaintiffs "must present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages," but they "need not prove the amount of loss with mathematical precision." *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992). "[T]he plaintiff bears the burden of establishing damages with 'reasonable certainty' and damage awards 'may not be based on pure speculation or conjecture.'" *Artica v. J.B. Custom Masonry & Concrete, Inc.*, Nos. 09-CV-3796 (RER) & 11-CV-0842 (RER), 2012 WL 11945654, at *8 (E.D.N.Y. July 16, 2012) (quoting *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 581 (S.D.N.Y. 2010)).

As discussed above, Plaintiff testified that she was promised a salary of $85,000, a 401k, and health insurance, but that she was paid $500 a week in 2018 and a maximum of $700 a week thereafter. (Tr. at 35:2–7, 37:4–11, 43:13–15.)  Plaintiff's 1099 forms reflect that in 2018, Defendant RC Global paid her $24,044.12, and in 2019, Defendant USALFH paid her $28,000. (Def. Ex. 2.) Plaintiff's PayPal records reflect that she was paid $19,071.09 in 2019. (Pl. Ex. K.) During summation, Plaintiff made clear that her theory of actual damages was based on the disparity between what Defendant Tsimbler had promised to pay her compared to her compensation during her period of employment.[10] Plaintiff argues that this amount is appropriate because the pay discrepancy was

---

[10] Specifically, Plaintiff's counsel argued the following in summation:

If you find for Ms. Smart, you'll first be tasked with considering economic damages, lost wages. I would propose that you think about the difference between what she testified she was promised, the beginning of her employment, $85,000 annually, and then what she actually received, $700 weekly which is roughly $36,000 per year. That's a different of $50,000 annually. And over the course of three years, that's $150,000. This may sound like a large number, but over the course of three years, it's what Ms. Smart deserved. At $36,000 per year before taxes, she had no ability to save, no health insurance, no 529 account for her kids. She has nothing to show for that today.

(Tr. at 349:16–350:1.)

19

motivated by Defendants' discriminatory actions. (Mem. in Opp'n, ECF No. 55, at 16–17.) In instructing the jury as to damages, the Court stated that the jury may award Plaintiff "actual damages from one or more Defendants," "[m]eaning, an amount of money that compensates her for any economic losses she suffered as a result of that defendant's discrimination, retaliation, and/or defamation." (Tr. at 395:11–16; *see generally* Verdict Form, ECF No. 50 (finding Defendants liable for discrimination, retaliation, and defamation).)

Defendants argue that "there was no basis for the jury to award an identical sum of $50,000 from each of the three Defendants, especially since there has not been any evidence of earnings from Defendant USA Labor for Hire, Inc." (New Trial Mem., ECF No. 51-1, at 4–5.) As set forth above, however, Plaintiff's 1099 forms indicate that Defendant RC Global paid Plaintiff in 2018 and Defendant USALFH paid Plaintiff in 2019. Further, testimony concerning the similarities between and overlap of the Corporate Defendants also provided evidence that the corporations effectively operated as a single enterprise. (*See, e.g.*, Tr. at 216:23–225:3, 50:12–19.) Whether USALFH and RC Global operated as a single enterprise is a question of fact, and the Court finds that the testimony and documentary evidence, taken together, provided sufficient evidence for the jury to conclude that the Corporate Defendants operated jointly, that RC Global was Plaintiff's employer, effectively, in 2018, with USALFH acting as her employer in 2019, and that Defendant Tsimbler was her employer throughout. In addition, the record contains evidence that Defendant Tsimbler had promised Plaintiff compensation for her expenses related to her move to Grenada, and then refused to pay her after she had been fired, including a refusal to pay any of her relocation expenses to return to the United States. (Tr. at 48:21–49:11, 89:12–20, 91:22–92:2.)

Here, the jury could easily have concluded that Plaintiff's promised wages were approximately $191,250 (based on the evidence presented that her salary was to be $85,000 per year for each of 2018 and 2019 plus approximately $21,250 for October through December 2017 ($85,000/4=$21,250)). Her total compensation reflected on the 1099s during this period showed $52,044, resulting in a wage deficiency of $139,206. Plaintiff also presented evidence that Tsimbler failed to provide her the health insurance and 401k he had promised, and that he refused to provide compensation for Plaintiff's expenses and relocation back to the United States after she moved to Granada. Based on the totality of the evidence presented at trial and the fact that plaintiffs "need not prove the amount of loss with mathematical precision," the Court finds that the evidence supported a verdict of $50,000 in actual damages from each of the three Defendants, who essentially functioned as Plaintiff's joint employers. *Sir Speedy, Inc.* 957 F.2d at 1038; *see, e.g., Fisher v. Mermaid Manor Home for Adults, LLC*, No. 14-CV-3461 (WFK) (JO), 2016 WL 7330554 (E.D.N.Y. Dec. 16, 2016) (awarding actual and punitive damages).[11]

Lastly, Defendants argue that "Plaintiff failed to produce any income statements of her current employment and all her employment since she stopped working for any of the Defendants." (New Trial Mem., ECF No. 51-1, at 5.) However, as discussed above,

---

[11] Defendants also argue that Plaintiff failed to meet her burden of establishing loss of past earnings because "Plaintiff failed to produce a single tax return that would show her earnings." (New Trial Mem., ECF No. 51-1, at 5.) This argument is unavailing. The jury may base its verdict on the evidence in the record as the Court instructed them; who introduced the evidence is irrelevant. (Tr. at 372:10-16 (instructing jury that "[a]ny party is entitled to the benefit of any evidence, even when that evidence is from witnesses or documents introduced by another party").) Defendants did not and could not object to this instruction. Additionally, Defendants did not provide any source of authority for the proposition that the only evidence which may be considered is a tax return. As discussed above, the record evidence included 1099 forms as well as a summary of earnings from PayPal, from which the jury could determine loss of past earnings.

the jury's damages award is supported by the evidence Plaintiff introduced concerning the pay discrepancy between what Defendant Tsimbler promised to pay for her compensation and employment expenses, and what Defendants ultimately paid her; it did not include damages accrued after her employment ended. For all of these reasons, the Court finds that Plaintiff presented sufficient evidence to support a verdict of $50,000 in actual damages from each Defendant. Defendants' arguments regarding the actual damages award do not warrant a new trial.

      d.  <u>Emotional Distress</u>

Next, Defendants argue that "[t]he evidence does not support a finding of emotional distress, and the evidence does not support the damages awarded for such or punitive damages." (New Trial Mem., ECF No. 51-1, at 6.) The jury awarded Plaintiff $60,000 in compensatory damages for emotional distress: $50,000 from Defendant Tsimbler and $5,000 from each of the Corporate Defendants. (Verdict Form, ECF No. 50, at 6.) The jury also awarded $50,000 in punitive damages for emotional distress: $40,000 from Defendant Tsimbler and $5,000 from each of the Corporate Defendants. (*Id.* at 6–7.)

      i.  *Compensatory Damages for Emotional Distress*

Courts in this circuit have identified "three categories of damages for emotional distress: (1) garden variety; (2) significant; and (3) egregious," which are described as follows:

> In garden-variety claims, the evidence of emotional harm is limited to the plaintiff's testimony, which describes his or her injuries in vague or conclusory terms, and fails to relate the severity or consequences of the injury. These claims typically lack extraordinary circumstances and are not supported by medical testimony. Significant emotional distress claims are based on more substantial harm or offensive conduct and may be supported by medical testimony, evidence of treatment by a healthcare professional, and testimony from other witnesses. Egregious emotional distress claims yield the highest awards and are warranted only where the

employer's conduct was outrageous and shocking or affected the physical
health of the plaintiff.

*Sooroojballie v. Port Auth. of N.Y. & N.J.*, 816 Fed. App'x 536, 546 (2d Cir. 2020) (quoting

*Maher v. All Mortg. Banking Corp.*, No. 06-CV-5073 (DRH) (ARL), 2010 WL 3516153, at *2

(E.D.N.Y. Aug. 9, 2010), *report and recommendation adopted*, 2010 WL 3521921 (E.D.N.Y.

Sept. 1, 2010)); *see also Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319–20 (S.D.N.Y.

2018).

        "A compensatory award for emotional distress in a discrimination case may be

based on testimonial evidence alone and is not preconditioned on whether the plaintiff

underwent treatment, psychiatric or otherwise." *MacMillan v. Millennium Broadway*

*Hotel*, 873 F. Supp. 2d 546, 559 (S.D.N.Y. 2012) (alterations and quotation marks

omitted). In this Circuit, "[g]arden variety emotional distress claims generally merit

$30,000 to $125,000 awards." *Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y.

2009) (quotation marks omitted). However, New York courts "'vary widely in the

amount of damages awarded for mental anguish'" and courts "have upheld emotional

distress 'awards of more than $100,000 without discussion of protracted suffering, truly

egregious conduct, or medical treatment.'" *Patterson v. Balsamico*, 440 F.3d 104, 120 (2d

Cir. 2006) (quoting *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 78 (2d Cir. 2004),

*vacated on other grounds sub nom KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005)); *see also*

*Duarte*, 341 F. Supp. 3d at 320–25. In *Patterson*, for example, the court upheld an award

of $100,000 where "the plaintiff offered testimony of his humiliation, embarrassment,

and loss of self-confidence, as well as testimony relating to his sleeplessness, headaches,

[and] stomach pains." *Patterson*, 440 F.3d at 120.

        Here, Plaintiff presented evidence sufficient to support a finding of garden

variety emotional distress. As stated above, Plaintiff testified that she felt insulted and

exploited by Defendant Tsimbler, that he disrespected her, that other employees disrespected her because they saw how Defendant Tsimbler treated her, and that Defendant Tsimbler frequently and publicly berated and humiliated her. Drakes's testimony further supported Plaintiff's narrative and additionally illustrated how Plaintiff's emotional distress physically manifested in significant weight loss.

The Court finds that the evidence is sufficient to support a finding of garden variety emotional distress. Plaintiff presented evidence of "[her] humiliation, embarrassment, and loss of self-confidence, as well as testimony relating to [her physical condition]," just like the plaintiff in *Patterson*.[12] *Id.* at 120. Moreover, the jury's $60,000 award is well within the range of awards made for garden variety emotional distress claims in this Circuit. *See Dotson v. City of Syracuse*, No. 5:04-CV-1388 (NAM) (GJD), 2011 WL 817499, at *15 (N.D.N.Y. Mar. 2, 2011) ("'Garden variety' emotional distress claims generally merit $30,000 to $125,000 awards."). Accordingly, the Court finds that the compensatory damages verdict for emotional distress is not against the weight of the evidence.

### ii. *Punitive Damages for Emotional Distress*

As set forth above, the jury also awarded Plaintiff $50,000 in punitive damages for emotional distress: $40,000 from Defendant Tsimbler and $5,000 from each of the

---

[12] In light of the case law previously cited, the Court finds Defendants' argument concerning Plaintiff's failure to produce medical records unpersuasive. (*See* New Trial Mem., ECF No. 51-1, at 6.) *See, e.g.*, *MacMillan*, 873 F. Supp. 2d at 561–63 (holding that the evidence supported a finding of garden variety emotional distress even where the plaintiff's limited evidence did not include medical corroboration). Moreover, the Court notes that Plaintiff presented testimony that she sought medical treatment in Grenada and upon her return to the United States, and Plaintiff also introduced a WhatsApp chat reflecting messages dated January 12, 2020, and later between herself and a doctor she visited in Grenada. (Tr. at 104:4–17, 176:4–177:21, 329:17–332:8.)

24

Corporate Defendants. (Verdict Form, ECF No. 50, at 6–7.) Defendants contend that the evidence does not support such awards. (New Trial Mem., ECF No. 51-1, at 6.)

"Punitive damages are available under Title VII in cases where 'the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 384 (2d Cir. 2001) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529–30 (1999) (quotation marks omitted)). Under the NYCHRL, "a plaintiff is entitled to punitive damages where the wrongdoer's actions amount to willful or wanton negligence, or recklessness, or where there is a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." *Chauca v. Abraham*, 30 N.Y.3d 325, 329 (2017) (quotation marks omitted). "Direct evidence that an employer acted with knowledge that the discrimination and retaliation violated federal law is not required; rather, the requisite state of mind may be inferred from the circumstances." *Manzo v. Sovereign Motor Cars, Ltd.*, No. 08-CV-1229 (JG) (SMG), 2010 WL 1930237, at *2 (E.D.N.Y. May 11, 2010). Indeed, the court in *Zimmermann* held that general training in equal opportunity protocol and hiring practices is sufficient to infer awareness of Title VII requirements. *Zimmermann*, 251 F.3d at 385–86.

Defendants introduced evidence that Defendant Tsimbler consciously disregarded Plaintiff's rights or, at the very least, that his conduct was so reckless as to amount to such disregard. *Chauca*, 30 N.Y.3d at 329. Defense exhibit fourteen, "USA Labor For Hire Code of Ethics & Standards of Professional Conduct," states that Defendant USALFH is committed to "[r]espect[ing] the diversity of race, colour, sexual orientation, marital status, religion, gender, disability, or any other factor" of all team members. (Def. Ex. 14.) Defense exhibit fifteen, "Complaint Form for Reporting Sexual Harassment," provides a form for employees to report alleged incidents of sexual

harassment, as required by New York State Labor Law. (Def. Ex. 15.) Moreover, when Plaintiff's counsel asked Defendant Tsimbler whether RC Global had an anti-discrimination policy, Defendant Tsimbler responded "I believe every company must have the policy." (Tr. at 239:24–240:2.)

This evidence, taken together with the evidence described above regarding Defendant Tsimbler's abusive treatment of Plaintiff, is sufficient to establish that, at the very least, Defendant Tsimbler was aware of the laws prohibiting discrimination and sexual harassment and nonetheless engaged in conduct so reckless as to amount to a conscious disregard of Plaintiff's rights. *See Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 76 (E.D.N.Y. 2002) (concluding that "it was reasonable for the jury to infer that [the] managers knew that their actions were in violation of federal law simply by virtue of the well-established Supreme Court case law on discrimination and retaliation, the long standing statutory schemes proscribing such conduct, . . . and the common knowledge in today's society that employment discrimination is impermissible"); *id.* at 75 ("As an alternative to proving that the defendant knew it was acting in violation of federal law, egregious or outrageous acts may serve as evidence supporting an inference of the requisite evil motive." (quotation marks and alterations omitted)). For all of these reasons, the Court finds that the jury's award of punitive damages is not against the weight of the evidence.

e. Defamation

Defendants argue that "[t]he evidence is insufficient for a finding of defamation and any damages." (New Trial Mem., ECF No. 51-1, at 7.) Specifically, Defendants argue that "there is no evidence that the police officer in Grenada to whom the Plaintiff claims statements as to her chastity were made believed the statement allegedly made by Defendant Tsimbler." (*Id.*)

26

To establish a claim of defamation, a plaintiff must prove "that defendants made (1) a defamatory statement of fact (2) regarding the plaintiff (3) that was published to a third party (4) causing injury to plaintiff." *Nowak v. EGW Home Care, Inc.*, 82 F. Supp. 2d 101, 113 (W.D.N.Y. 2000); *see Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61 (2d Cir. 1993). However, where the statement at issue concerns a plaintiff's promiscuity or unchasteness, plaintiffs need not prove injury. *See, e.g.*, *Bernstein v. O'Reilly*, No. 17-CV-9483 (DAB), 2019 WL 10995111, at *5 (S.D.N.Y. Mar. 5, 2019); *Jalal v. Shanahan*, No. 16-CV-281 (CBA) (LB), 2018 WL 10466837, at *6 (E.D.N.Y. May 10, 2018).

As discussed *supra*, Plaintiff testified that Defendant Tsimbler told a police officer that Plaintiff "runs around in Grenada in a car with a man. That's all she did in Grenada, that's what I'm paying her for, you know, to run around and act like way slut in a car and sleeping with men in a car." (Tr. at 93:16–24.) Under New York law, given that this comment directly made reference to "sleeping with men," Plaintiff need not demonstrate that the third party believed the statement, nor that Plaintiff suffered injury. *See, e.g.*, *Nowak*, 82 F. Supp. 2d at 113. There was sufficient evidence for the jury to determine that Defendant Tsimbler defamed Plaintiff when he made this statement.

Defendants next argue that "even in defamation per se cases, where there is no proof as to damages, only nominal damages are awarded." (New Trial Mem., ECF No. 51-1, at 7.) Under New York law, plaintiffs may be awarded compensatory and punitive damages for defamation claims. *See, e.g.*, *Wachs v. Winter*, 569 F. Supp. 1438, 1443–44 (E.D.N.Y. 1983); *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 175 (2d Cir. 2000). Damage awards in defamation cases are particularly unique; "[i]n actions for other torts there is generally . . . some standard by which the reasonableness of an award of damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part." *Bouveng v. NYG Cap.,*

*LLC*, 175 F. Supp. 3d 280, 335 (S.D.N.Y. 2016) (quotation marks omitted). "For that reason, the amount of such damages is peculiarly within the jury's province, requiring prudence and restraint by a trial court in the exercise of its discretion over these awards." *Id.* (alterations omitted); *see Cantu v. Flanigan*, 705 F. Supp. 2d 220, 227 (E.D.N.Y. 2010) ("Due to the uncertainties in calculating [non-economic] damage awards [in defamation cases], New York courts have consistently held that deference to the jury's findings is required in considering whether to reduce a jury's award.").

Here, the jury determined that Plaintiff "was subjected to defamation under New York Common Law[] by Oleg Tsimbler." (Verdict Form, ECF No. 50, at 5.) However, the jury was not asked to specifically award damages for defamation separate and apart from their conclusions as to the appropriate compensatory and punitive damages awards. (*See generally* Verdict Form, ECF No. 50, at 5–7.) As discussed above, there was sufficient evidence for the jury to award emotional distress and punitive damages for Plaintiff's other claims, excluding defamation. Moreover, given the deference due to a jury's damages award for a defamation claim, the Court would not disturb the reasonable awards here. Defendants' motion for a new trial on this ground is without merit.

        f.   <u>Employee Status</u>

Lastly, Defendants argue that "[t]he evidence does not support the finding that Plaintiff was a regular employee and not an independent contractor." (New Trial Mem., ECF No. 51-1, at 7.) Specifically, Defendants argue that the following factors establish that Plaintiff was an independent contractor: (1) Plaintiff was issued 1099 forms; (2) Plaintiff had independent knowledge and skills, and was "not controlled in any way"; (3) Plaintiff asked Defendant Tsimbler about profits; (4) Plaintiff did not have a fixed schedule; (5) Plaintiff was not trained "with respect to the Grenadian projects";

and (6) Plaintiff was primarily involved with the Grenadian project, "which had nothing to do with any of the Defendants' principal business of staffing housekeepers in hotels in the United States." (*Id.* at 8–9.)

Independent contractors are covered under the NYCHRL. N.Y.C. Admin. Code, section 8-102(5). However, independent contractors are not covered by Title VII. *See, e.g.*, *Gulino v. N.Y.S. Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006) (stating that "the existence of an employer-employee relationship is a primary element of Title VII claims"). Courts in this circuit "apply a set of non-exhaustive factors set forth by the Supreme Court that, when present, may indicate the existence of an employer-employee relationship." *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 843 (2d Cir. 2022). These factors include the following:

> [T]he hiring party's right to control the manner and means by which the product is accomplished . . . [;] the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in the business; the provision of employee benefits; and the tax treatment of the hired party.

*Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52 (1989) (footnotes omitted). "Broadly, these factors examine whether the alleged employer paid the employees' salaries, hired and fired them, and had control over their daily employment activities." *Felder*, 27 F.4th at 843 (quotation marks and alterations omitted).

Plaintiff provided sufficient evidence for the jury to find that she was an employee, not an independent contractor. For example, Plaintiff testified that although she "was hired to work 9:00 to 5:00," she was always "on call"; in other words, "[i]f

Oleg wanted to call [her] at 8:00 or 9:00 at night, then he did." (Tr. at 38:21–39:4.)

Plaintiff also testified that "Oleg would call [her] and tell [her]" to discuss and assign

tasks while in Grenada, and that "every day on the hour [she] had to answer [her]

phone. [She] could not not answer the phone because he wanted to know where [she]

was every minute of the day." (*Id.* at 61:14–20.) Plaintiff testified that she was working

exclusively and full time for Defendant Tsimbler. (*Id.* at 44:16–21.) Moreover, although

Plaintiff testified that she was "paid on a 1099," she further testified that the accountant

for Defendant USA Labor for Hire, Inc. stated that 1099s are "how [they] pay all of

[their] employees." (Tr. at 43:12, 43:22–24.) Further, Plaintiff testified that in addition to

her work with hotel contracts and her work in Grenada, Plaintiff was "driving

[Defendant Tsimbler] around and . . . taking him places," doing "different . . . tasks,"

"picking people up," "doing favors" for people, and "selling cars." (*Id.* at 122:14–125:3.)

Plaintiff also testified that she had an office space. (*Id.* at 115:9–13.) Lastly, Plaintiff

testified that Defendant Tsimbler provided her with a car "for [Plaintiff] to get to his

office" and for her to run errands for him. (*Id.* at 51:25–52:8.) In addition, the lengthy

text message chain introduced into evidence demonstrated frequent contact between

Plaintiff and Tsimbler and that Tsimbler often provided Plaintiff directions and

requested updates of her. (*See* Pl. Ex. L.)

Plaintiff provided testimony and evidence concerning Defendants' "right to

control the manner and means by which" Plaintiff worked; "the location of the work";

whether Defendants "ha[d] the right to assign additional projects to the hired party";

"the extent of the hired party's discretion over when and how long to work"; and "the

provision of employee benefits." *Reid*, 490 U.S. at 751–52. At trial, the Court provided a

detailed instruction to the jury regarding how to decide whether Plaintiff was an

independent contractor or an employee and explicitly charged the jury that if they

found "that the plaintiff was an independent contractor, you must find that the defendants are not liable for discrimination or retaliation under Title VII." (Tr. at 391:16–18.) Ultimately, the jury returned a verdict for Plaintiff on the Title VII claims. There was sufficient evidence for the jury to conclude that Plaintiff was an employee, not an independent contractor. Defendants' motion for a new trial on this ground is therefore denied.

\*    \*    \*    \*    \*

For all of these reasons, the Court finds that (1) Defendants' argument that the verdict was based on inadmissible hearsay is without merit; (2) Defendants did not object to Plaintiff's comments regarding exploitation in opening and closing statements, which comments were supported by the evidence and were not unfairly prejudicial; (3) there was sufficient evidence to support the jury's findings as to actual damages; (4) there was sufficient evidence to support the jury's findings as to emotional distress and the damages awarded for both emotional distress and punitive damages; (5) there was sufficient evidence to support the jury's finding as to defamation; and (6) there was sufficient evidence to support the jury's finding as to Plaintiff's employee status. The Court finds that the verdict is not "against the weight of the evidence" and does not constitute "a miscarriage of justice." *Manley*, 337 F.3d at 245. Defendants' motion for a new trial under Federal Rule of Civil Procedure 59(a) is denied.

**C. Remittitur**[13]

1. *Legal Standards*

"When a trial court finds a damage verdict to be excessive, it may order a new trial on all issues or only on the question of damages. Alternatively, the court may grant remittitur." *MacMillan*, 873 F. Supp. 2d at 559 (alterations and quotation marks omitted). "Remittitur is appropriate to reduce verdicts only in cases in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award." *Werbungs Und Commerz Union Austalt v. Collector's Guild, Ltd.*, 930 F.2d 1021, 1027 (2d Cir. 1991) (quotation marks omitted).

Under federal law, "a jury's damage award may not be set aside as excessive unless the award is so high as to shock the judicial conscience and constitute a denial of justice." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quotation marks omitted); *see also Scott v. Rosenthal*, 53 Fed. App'x 137, 142 (2d Cir. 2002) (same). In other words, "before acting the Court must be satisfied that the result is not based upon a rational consideration of the evidence and the proper application of the law." *Reynolds v. Pegler*, 123 F. Supp. 36, 39 (S.D.N.Y. 1994). Alternatively, for New York law claims, courts consider a damage award excessive only if it "deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c).

---

[13] The Court notes that Defendants do not make any arguments in support of a motion for remittitur. However, because Defendants state that they move "pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure, or in the alternative, Remittitur," the Court nevertheless evaluates whether remittitur is appropriate. (Notice of Defs.' Post Trial Motions, ECF No. 51; New Trial Mem., ECF No. 51-1, at 1.)

2.  *Analysis*

As detailed above, the jury found Defendants liable for hostile work
environment in violation of both Title VII and the NYCHRL, retaliation under both Title
VII and the NYCHRL, and defamation under New York common law. Accordingly, the
Court will analyze whether remittitur is appropriate under the federal standard. *See,
e.g.*, *Patterson*, 440 F.3d at 120 (analyzing a punitive damages award under the federal
standard when the damages were awarded on both federal and state claims).

a.  <u>Actual Damages</u>

For the reasons discussed *supra*, the Court finds that there is sufficient evidence
to support the jury's award of $50,000 in actual damages from each Defendant.
Consequently, and for the foregoing reasons, the Court finds that the actual damages
award was not excessive nor a miscarriage of justice, and Defendants' motion for
remittitur is denied as to actual damages. *See, e.g., Kuper v. Empire Blue Cross & Blue
Shield*, No. 99-CV-1190 (JG), 2003 WL 359462, at *17 (S.D.N.Y. Feb. 18, 2003) (finding
that, "for the reasons discussed above in the motion for judgment as a matter of law
section, . . . the back pay award was not excessive or a miscarriage of justice"); *Clarke v.
One Source, Inc.*, No. 99-CV-2323 (RPP), 2002 WL 31458238, at *5 (S.D.N.Y. Nov. 1, 2002)
(concluding that the jury's calculation of backpay was supported by the evidence and
therefore was "not so inappropriate as to shock the conscience of the Court").

b.  <u>Compensatory Damages for Emotional Distress</u>

As stated above, the jury awarded Plaintiff $60,000 in compensatory damages for
emotional distress. Plaintiff presented testimony evidencing her feelings of humiliation,
embarrassment, stress, disrespect, and mental anguish, as well as physical
manifestations of her distress. Also as discussed above, New York courts "'vary widely
in the amount of damages awarded for mental anguish'" and courts "have upheld

emotional distress 'awards of more than $100,000 without discussion of protracted suffering, truly egregious conduct, or medical treatment.'" *Patterson*, 440 F.3d at 120 (quoting *Meacham*, 381 F.3d at 78); *see also Duarte*, 341 F. Supp. 3d at 320–25 (reducing an award to $125,000 where testimony established that the plaintiff suffered from anxiety, sleeplessness, stomach aches, headaches, and loss of self-esteem, even where "significant components of Plaintiff's testimony regarding her symptoms of emotional distress [were] entirely uncorroborated"). Indeed, "[g]arden variety emotional distress claims generally merit $30,000.00 to $125,0000.00 awards," although "courts have reduced such awards to as little as $10,000" "[w]here a plaintiff offers only sparse evidence of emotional distress." *Duarte*, 341 F. Supp. 3d at 320 (quotation marks omitted); *see also Ravina v. Columbia Univ.*, No. 16-CV-2137 (RA), 2019 WL 1450449, at *11 (S.D.N.Y. Mar. 31, 2019) (collecting cases and observing that amounts for "garden variety" emotional distress damages are in the $30,000 to $125,000 range). Notably, as to garden variety emotional distress, the "evidence is generally limited to the plaintiff's testimony, described in vague or conclusory terms, without evidence of the duration, severity or consequences of the condition, and minimal or no evidence exists of medical treatment." *Kuper*, 2003 WL 359462, at *13. Here, given the evidence at trial, the Court finds that jury's award of $60,000 is not excessive. Defendants' motion for remittitur as to the compensatory damages award is denied.

       c.  <u>Punitive Damages for Emotional Distress</u>

     Courts in this Circuit are guided by three factors in analyzing a jury's award of punitive damages: "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (quoting *BMW of N. Am. Inc. v. Gore*, 517 U.S.

559, 575 (1996)). The court in *Gore* noted that reprehensibility is "[p]erhaps the most important" factor in assessing punitive damages. *Gore*, 517 U.S. at 575. The court also "identified certain types of 'aggravating factors' that are 'associated with particularly reprehensible conduct,'" including "whether a defendant has engaged in repeated instances of misconduct." *Lee*, 101 F.3d at 809 (quoting *Gore*, 517 U.S. at 576).

As to the first factor, reprehensibility, there can be little doubt that Defendant Tsimbler's treatment of Plaintiff was reprehensible. *See, e.g.*, *Colbert v. Furumoto Realty, Inc.*, 144 F. Supp. 2d 251, 258 (S.D.N.Y. 2001) ("We fail to see how racial discrimination is not sufficiently reprehensible to warrant a punitive damages award."). Defendant Tsimbler repeatedly called Plaintiff racially and gendered offensive names, such as "sexy black Katya, exotic Katya, [and] Grenadian black princess," and would often introduce Plaintiff to other people as "sexy black Caribbean." (*See* Tr. at 139:9–16, 140:15–20, 141:12–14.)  Defendant Tsimbler screamed at, berated, and demeaned Plaintiff, often in public. (Tr. at 62:3–8, 62:19–25, 63:7–9 (testifying that "when he would first introduce me, it would be like, oh, my beautiful Katya or my sexy, beautiful Katya. . . . [T]hen two minutes later . . . he would . . . say shut up . . . basically, you don't have anything to say, or take me aside and like yell and scream at me. . . . [H]e would just chastise me every single minute that he got," and "[h]e didn't speak to any of the other men workers that I worked with . . . that way." Another time, "he just started berating me on the phone, on speaker . . . with the employees there").) Given the repeated nature of Defendant Tsimbler's abusive conduct, which was often accompanied by sexist or racist epithets, the Court finds that there was substantial evidence at trial to establish that Defendant Tsimbler's conduct was reprehensible.

The second factor, the ratio of punitive to compensatory damages, also counsels against remittitur. Although there is no "mathematical bright line between the

constitutionally acceptable and the constitutionally unacceptable that would fit every case," only in "breathtaking cases" is remittitur appropriate. *Mugavero*, 680 F. Supp. 2d at 589 (alterations and quotation marks omitted). Here, where the jury awarded $150,000 in actual damages, $60,000 in compensatory emotional distress damages, and $50,000 in punitive damages, "the punitive damages award . . . is a *fraction* of, not a multiple of, the compensatory award, and accordingly the award does not 'cross the line into the area of constitutional impropriety.'" *Id.* (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)); *see also Patterson*, 440 F.3d at 121 (upholding a punitive damages award that was a "relatively small fraction of the compensatory damages, rather than a multiple thereof, and thus [was] not disproportionately large by comparison").

Lastly, the difference between this remedy and the civil penalties authorized or imposed in comparable cases also supports the jury's award. Comparable cases indicate that $50,000 in punitive damages is not inappropriate based on Defendant Tsimbler's conduct. *See, e.g.*, *DeCurtis v. Upward Bound Int'l, Inc.*, No. 09-CV-5378 (RJS), 2011 WL 4549412, at *6 (S.D.N.Y. Sept. 27, 2011) (awarding $75,000 in punitive damages on the plaintiff's sex discrimination and retaliation claims); *Small v. N.Y. State Dep't of Corrs. & Cmty. Supervision*, No. 12-CV-1236S (WS), 2019 WL 1593923, at *13–15 (W.D.N.Y. Apr. 15, 2019) (upholding the jury's award of $50,000 in punitive damages in a discrimination, hostile work environment, and retaliation case where Defendant repeatedly harassed the plaintiff). Accordingly, the Court finds that the $50,000 punitive damages award does not shock the conscience nor constitute a denial of justice; Defendants' motion for remittitur is denied as to the punitive damages award.

d. Defamation

The jury did not specify whether an award for defamation was included in its award of compensatory and punitive damages, as discussed above. However, because there was sufficient evidence for the jury to award emotional distress and punitive damages for Plaintiff's other claims, and because the Court finds that the $60,000 and $50,000 awards for compensatory and punitive damages, respectively, do not shock the conscience or constitute a denial of justice, Defendants have not established that remittitur is warranted.

*    *    *    *    *

The Court finds that the jury's awards of (1) $150,000 for actual damages; (2) $60,000 for compensatory damages for emotional distress; and (5) $50,000 for punitive damages for emotional distress do not shock the conscience or constitute a denial of justice, and therefore are not excessive. Defendants' motion for remittitur is denied.

## II. Plaintiff's Motion for Pre-Judgment and Post-Judgment Interest

### A. Legal Standards

1. *Pre-Judgment Interest*

Pre-judgment interest awards are intended "to prevent an employer from attempting to enjoy an interest-free loan for as long as it can delay paying out back wages." *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) (quotation marks omitted). "While the decision to award prejudgment interest is left to the discretion of the district courts, the Second Circuit has stated that '[t]o the extent . . . that damages awarded to the plaintiff represent compensation for lost wages, it is ordinarily an abuse of discretion not to include prejudgment interest.'" *Shannon v. Fireman's Fund Ins. Co.*,

136 F. Supp. 2d 225, 230 (S.D.N.Y. 2001) (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir. 1998)); *see also Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 94 (E.D.N.Y. 2020).

"Although neither Title VII nor the NYSHRL or the NYCHRL make specific references to pre-judgment interest, courts in this circuit have interpreted the NYSHRL's mandate to make victims 'whole' to allow for an award of pre-judgment interest and have also applied this principle to the NYCHRL." *Santiago v. Crown Heights Ctr. for Nursing & Rehab.*, No. 15-CV-4381 (DLI) (CLP), 2017 WL 9482107, at *24 (E.D.N.Y. Feb. 24, 2017), *report and recommendation adopted in part and modified on other grounds*, 2017 WL 4410807 (E.D.N.Y. Sept. 30, 2017). In awarding pre-judgment interest in federal cases, courts in the Second Circuit "often apply the rate of interest provided in 28 U.S.C. § 1961."[14] *Robinson v. Instructional Sys., Inc.*, 80 F. Supp. 2d 203, 208 (S.D.N.Y. 2000); *Antoine*, 489 F. Supp. 3d at 94.

Courts apply a three-step methodology in calculating a pre-judgment interest award. *See Robinson*, 80 F. Supp. 2d at 208; *McIntosh v. Irving Tr. Co.*, 873 F. Supp. 872, 884 (S.D.N.Y. 1995). "First, the awards should be divided pro rata over the appropriate time period." *Robinson*, 80 F. Supp. 2d at 208. "Second, once the award is divided, the average annual United States treasury bill rate of interest referred to in 28 U.S.C. § 1961 will be applied." *Id*. "Third and finally, in order to guarantee compensation to the plaintiff, the interest will be compounded annually." *Id*.

───────────────

[14] Under New York law, "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute." N.Y. C.P.L.R. § 5004. This principle applies to awards under both the NYSHRL and the NYCHRL. *Sass v. MTA Bus Co.*, 6 F. Supp. 3d 238, 259 (E.D.N.Y. 2014). However, where actual damages are awarded for claims brought under both federal and state or city law, courts apply the federal rate provided under 28 U.S.C. § 1961. *See, e.g.*, *Robinson*, 80 F. Supp. 2d at 208.

2.  *Post-Judgment Interest*

Post-judgment interest is mandatory and governed by federal statute. *See* 28

U.S.C. § 1961(a); *Plaza Motors of Brooklyn, Inc. v. Rivera*, No. 19-CV-6336 (LDH) (RLM),

2020 WL 9814102, at *12 (E.D.N.Y. Sept. 17, 2020), *report and recommendation adopted*,

Nov. 30, 2020 ECF Order Adopting R. & R.

**B.  Analysis**

1.  *Pre-Judgment Interest*

Plaintiff seeks an award of pre-judgment interest on the back pay award of

$150,000. (*See* Fees Mot., ECF No. 54, at 17–18.) Because Plaintiff was terminated no later

than mid-January 2020, pre-judgment interest is appropriate for the time period from

January 15, 2020, through the date of final judgment. (*See* Tr. at 136:11–12; *see also supra*

note 12 (discussing timing of Plaintiff's treatment by a doctor in Grenada in early

January 2020).) *See, e.g., McIntosh*, 873 F. Supp. at 883–84 (calculating the relevant time

period as the time between the plaintiff's termination to the date the judgment is

entered). Accordingly, the Court awards Plaintiff pre-judgment interest on $150,000, at

the rate of interest referred to in 28 U.S.C. § 1961, from January 15, 2020, through the

date of final judgment, which interest is to be compounded annually.

2.  *Post-Judgment Interest*

Post-judgment interest is mandatory and governed by federal statute. *See* 28

U.S.C. § 1961(a). Therefore, the Court awards Plaintiff post-judgment interest using the

federal rate set forth in 28 U.S.C. § 1961(a), calculated from the date the Clerk of Court

enters final until the date of payment. *See id.* § 1961(a)–(b).

### III. Plaintiff's Motion for Attorneys' Fees and Costs

#### A. Legal Standards

##### 1. *Title VII and the NYCHRL*

Under both Title VII and the NYCHRL, a prevailing plaintiff is entitled to an award of "reasonable" attorney's fees and costs. 42 U.S.C. § 2000e-5(k); N.Y.C. Admin. Code § 8-502(g); *see Antoine*, 489 F. Supp. 3d at 102–03. "Since the Title VII and NYCHRL provisions are 'substantively and textually similar . . . the reasonableness of the fees [are] analyzed the same regardless of which provision provides [plaintiff's] recovery.'" *Antoine*, 489 F. Supp. 3d at 103 (alterations in original) (quoting *Moore v. Houlihan's Rest., Inc.*, No. 07-CV-3129 (ENV) (RER), 2011 WL 2470023, at *7 n.10 (E.D.N.Y. May 10, 2011), *report and recommendation adopted*, 2011 WL 2462194 (E.D.N.Y. June 17, 2011)).

##### 2. *Reasonable Attorneys' Fees*

Courts have broad discretion in determining a reasonable attorney's fee. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183–84 (2d Cir. 2008). The method for determining reasonable fees in this circuit is based on a number of factors, such as the labor and skill required, the difficulty of the issues, the attorney's customary hourly rate, the experience, reputation, and ability of the attorney, and awards in similar cases. *See Arbor Hill*, 522 F.3d at 186 n.3, 190. In particular, when assessing an attorney's requested hourly rate, courts typically consider other rates awarded in the district in which the reviewing court sits. This is known as the "forum rule." *See Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174–75 (2d Cir. 2009) (recounting history of the forum rule).

Ordinarily, "the burden is on the fee applicant to produce satisfactory evidence — in addition to the attorney's own affidavits — that the requested rates are in line with

those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience[,] and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). "In addition to the parties' evidentiary submissions, the Court may consider its own experience and familiarity with the case and with rates generally charged." *Lin v. Joe Japanese Buffet Rest., Inc.*, No. 17-CV-3435 (WFK) (CLP), 2022 WL 2718584, at *4 (E.D.N.Y. June 7, 2022), *report and recommendation adopted*, 2022 WL 2716487 (E.D.N.Y. July 13, 2022).

Once a court determines the reasonable hourly rate, it must multiply that rate by the number of hours reasonably expended to determine the presumptively reasonable fee. *See Arbor Hill*, 522 F.3d at 190; *id.* at 183 ("[T]he district court should generally use the prevailing hourly rate in the district where it sits to calculate what has been called the 'lodestar' — what we think is more aptly termed the 'presumptively reasonable fee . . . .'"); *see also Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) ("Both this Court and the Supreme Court have held that the lodestar — the product of a reasonable hourly rate and the reasonable number of hours required by the case — creates a 'presumptively reasonable fee.'" (quoting *Arbor Hill*, 522 F.3d at 183)). To calculate the presumptively reasonable fee, the Court looks at what a reasonable, paying client would be willing to pay, "bear[ing] in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill*, 522 F.3d at 190; *see also Simmons*, 575 F.3d at 174 (observing that the presumptively reasonable fee is "what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively" (quotation marks omitted)).

With very limited exceptions, "contemporaneous time records are a prerequisite for attorney's fees in this Circuit." *Scott v. City of New York*, 626 F.3d 130, 133 (2d Cir.

2010) (quotation marks omitted); *see also Finkel v. Universal Elec. Corp.*, 970 F. Supp. 2d 108, 127–28 (E.D.N.Y. 2013). The court must review these time records and the hours an attorney billed to determine reasonableness and, in doing so, should examine the value of the work product and "exclude excessive, redundant or otherwise unnecessary hours." *Concrete Flotation Sys., Inc. v. Tadco Constr. Corp.*, No. 07-CV-319 (ARR) (VVP), 2010 WL 2539771, at *5 (E.D.N.Y. Mar. 15, 2010) (quoting *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 2009)), *report and recommendation adopted*, 2010 WL 2539661 (E.D.N.Y. June 17, 2010). "[A] fee award should be based on scrutiny of the unique circumstances of each case[.]" *McDaniel v. County of Schenectady,* 595 F.3d 411, 426 (2d Cir. 2010).

      a.  <u>Hourly Rates</u>

In the Title VII context, "[c]ourts in this District have approved the following hourly rates for attorneys practicing in the Eastern District of New York: $300 to $450 for partners in law firms, $200 to $325 for senior associates, . . . $100 to $200 for junior associates," and $70 to $100 for paralegals. *Antoine*, 489 F. Supp. 3d at 103 (quotation marks omitted); *Rivera v. ABM Indust., Inc.*, No. 22-CV-1232 (EK) (PK), 2023 WL 6850327, at *4 (E.D.N.Y. Sept. 29, 2023) (same), *report and recommendation adopted*, 2023 WL 6845866 (E.D.N.Y. Oct. 17, 2023); *EEOC v. Stardust Diners, Inc.*, No. 20-CV-3122 (ENV) (LGD), 2023 U.S. Dist. LEXIS 140035, at *13 (E.D.N.Y. Aug. 10, 2023) (finding $400 for partner and $300 to $375 for senior associates "consistent with New York standards and presumptively reasonable"), *report and recommendation adopted*, 2023 U.S. Dist. LEXIS 174753 (E.D.N.Y. Sept. 28, 2023); *Saleh v. Pretty Girl, Inc.*, No. 09-CV-1769 (RER), 2022 WL 4078150, at *31–33 (E.D.N.Y. Sept. 6, 2022) (finding $450 for "a highly experienced civil rights attorney," $300 for counsel, $275 for of counsel, $200 for senior associates, and $100 for paralegals).

b.  Total Number of Hours

As a general matter, courts agree with fee applicants' requests when the amount of hours billed is reasonable. *See Gonzales v. Trees R US Inc.*, No. 14-CV-7487 (JMW), 2022 WL 3045714, at *2 (E.D.N.Y. Mar. 11, 2022). By contrast, when the number of hours billed is excessive, courts may make a blanket reduction. *Lilly v. City of New York*, 934 F.3d 222, 234 (2d Cir. 2019). "When considering an application for attorneys' fees, the court should exclude 'excessive, redundant, or otherwise unnecessary' hours." *Rosen v. LJ Ross Assocs., Inc.*, No. 19-CV-5516 (ARR) (VMS), 2022 WL 493728, at *6 (E.D.N.Y. Jan. 24, 2022) (quoting *Hensley*, 461 U.S. at 434), *report and recommendation adopted*, 2022 WL 493274 (E.D.N.Y. Feb. 17, 2022).

Courts should generally exclude "any 'hours dedicated to severable unsuccessful claims.'" *Mugavero*, 2010 WL 451045, at *9 (emphasis omitted) (quoting *Quaratino*, 166 F.3d at 425). However, "[a]ttorney's fees may be awarded for unsuccessful claims as well as successful ones . . . where they are inextricably intertwined and involve a common core of facts or are based on related legal theories." *Quaratino*, 166 F.3d at 425 (quotation marks omitted). Accordingly, "where unsuccessful claims are not 'severable,' the Court may still, in the exercise of its discretion to determine the 'reasonable number of hours worked,' consider, among other factors, 'the degree of success obtained.'" *Abel v. Town Sports Int'l, LLC*, No. 09-CV-10388 (DF), 2012 WL 6720919, at *33 (S.D.N.Y. Dec. 18, 2020); *see also G.B. ex rel. NB v. Tuxedo Union Free Sch. Dist.*, No. 09-CV-859 (KMK), 2012 WL 4108111, at *4 (S.D.N.Y. Sept. 18, 2012) ("The task of determining whether to reduce a fee award for limited success is left to the discretion of the district court, and should be guided by the degree of success obtained, rather than by 'a mathematical approach comparing the total number of issues in the case with those actually prevailed upon.'" (quoting *Hensley*, 461 U.S. at 435 n.11)).

In determining a reasonable number of hours, "[t]he relevant issue . . . is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992). Courts "must make a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended." *Hernandez v. Quality Blacktop Servs., Inc.*, No. 18-CV-4862 (RJD) (RML), 2021 WL 1413246, at *11 (E.D.N.Y. Mar. 10, 2021) (quotation marks omitted), *report and recommendation adopted*, 2021 WL 1207316 (E.D.N.Y. Mar. 30, 2021). At the same time, the Second Circuit has observed that courts "'need not, and indeed should not, become green-eyeshade accountants'" when evaluating fee requests. *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 601 (2d Cir. 2020) (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)).

**B.  Analysis**

Plaintiff's counsel's fee request is summarized as follows:[15]

| Attorney | Title | Hours Worked | Hourly Rate | Total Fee |
|---|---|---|---|---|
| Steven Fingerhut | Partner | 146.2 | $400 | $58,480 |
| Gregory Calliste, Jr. | Partner | 68.2 | $400 | $27,280 |

---

[15] The Court noted discrepancies in the papers regarding the amount summarized as the total fee request and the number of hours worked by each billing professional. (*See, e.g.*, Fingerhut Decl., ECF No. 53.) Accordingly, the Court derived the hours worked for each person from the hours listed in the billing records. (*See* Billing Records, ECF No. 56; Suppl. Billing Records, ECF No. 60-1.) The Court further notes that the hours listed in the "Hours Worked" column include the sum of the hours worked as reflected in both the first declaration (containing all hours worked *except for* those spent on post-trial motion practice) and the supplemental declaration (containing *only* the hours spent on post-trial motion practice), where applicable. The total fee is derived by multiplying the hours worked by each billing professional's hourly rate. The Court is of course permitted to "properly calculate" items in the record. *See Fisher*, 948 F.3d at 601.

| Attorney | Title | Hours Worked | Hourly Rate | Total Fee |
|---|---|---|---|---|
| Alexandria Jean-Pierre | Associate | 110.4 | $350 | $38,640 |
| Yusha Hiraman | Associate | 92.7 | $250 | $23,175 |
| Zachary Randall | Associate | 10.5 | $250 | $2,625 |
| Sara Callow | Associate | 61.8 | $250 | $15,450 |
| Jennifer Astudillo | Paralegal | 39.2 | $100 | $3,920 |
| Susanna Kuralt | Paralegal | 40.6 | $100 | $4,060 |
| **TOTAL** | | 569.6 | | $173,630 |

In support of this request, Plaintiff's counsel submitted billing records that document specific tasks performed, hours worked, and the hourly rates requested for attorneys and support staff. (Billing Records, ECF No. 56; Suppl. Billing Records, ECF No. 60-1.) Plaintiff's counsel also detailed the qualifications and professional experience for all attorneys and support staff on behalf of whom he requests fees. (Fees Mot., ECF No. 54, at 8–15; Fingerhut Decl., ECF No. 53, ¶¶ 7–50; Fingerhut Suppl. Decl., ECF No. 60.) Defendants have not filed any responses or objections to Plaintiff's fee requests. The Court finds the requested hourly rates and number of hours worked to be reasonable.

    1. *Reasonable Attorneys' Fees*

      a. <u>Hourly Rates</u>

As set forth above, the hourly rates for Title VII cases in this district typically range from $300 to $450 for partners, $200 to $375 for senior associates, and $70 to $100 for paralegals. *Antoine*, 489 F. Supp. 3d at 103 (quotation marks omitted); *Stardust Diners, Inc.*, 2023 U.S. Dist. LEXIS 140035, at *13. Plaintiff's counsel seeks hourly rates of

$400 for partners, $250 to $350 for associates, and $100 for paralegals.[16] (Fingerhut Decl., ECF No. 53, ¶¶ 7, 16, 33, 42, 47, 51–56; Fingerhut Suppl. Decl., ECF No. 60, at 2–4.) Here, because the rates counsel seeks are within the range of typical rates awarded in Title VII cases and commensurate with the attorneys' professional experience, the Court finds counsel's rates to be reasonable.

b. Total Number of Hours

In this case, Plaintiff's counsel requests compensation for 569.6 hours, which includes 146.2 hours by Mr. Fingerhut, 110.4 hours by Ms. Jean Pierre, 68.2 hours by Mr. Calliste, 92.7 hours by Ms. Hiraman, 39.2 hours by Ms. Astudillo, 40.6 hours by Ms. Kuralt, 10.5 hours by Mr. Randall, and 61.8 hours by Ms. Callow. (*See* Billing Records, ECF No. 56; Suppl. Billing Records, ECF No. 60-1.) This of course leads to the question of whether that represents a reasonable amount of time spent in this litigation. *See generally Grant*, 973 F.2d at 99–100 (discussing whether the district court's determination of the number of hours in calculating the lodestar was reasonable).

This case has been proceeding for over three years. (*See* Compl., ECF No. 1 (filed on November 17, 2020).) Plaintiff's counsel engaged in mediation. (Status Rep., ECF No. 25.) The litigation involved moderately complex factual and legal issues. (*See, e.g.*, Fees Mot., ECF No. 54, at 16 (explaining that Plaintiff "had to navigate suing a complex web of corporate Defendants which were dissolved and then re-created in at least four different iterations").) The case ultimately went to trial and counsel briefed detailed

---

[16] Although the declaration does not identify Ms. Jean-Pierre or Ms. Hiraman as senior or junior associates by title, based on the number of years they have been practicing and their amount of experience, the Court finds that it would be reasonable to classify them as senior associates. (*See* Fingerhut Decl., ECF No. 53, ¶¶ 26–46.) For the same reasons, the Court finds that it would be reasonable to classify Mr. Randall and Ms. Callow as junior or mid-level associates. (*See* Fingerhut Suppl. Decl., ECF No. 60, ¶¶ 9–25.)

post-trial motions. These factors all weigh in favor of the conclusion that 569.6 hours is a reasonable number of hours spent on this litigation. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).

On the other hand, however, the procedural history of this case is fairly simple: counsel engaged in relatively minimal pre-trial motion *in limine* practice, participated in only one round of settlement negotiations, and the trial lasted three days, including jury selection. At first blush, the requested hours appear to be slightly excessive when compared to the hours awarded in cases with similar claims and lengthier trials or more complex procedural histories. *See Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 210 (E.D.N.Y. 2006) ("Although each case is obviously unique, cases involving similar claims that resulted in jury trials of similar length are instructive."); *see, e.g., Abel*, 2012 WL 6720919, at *1, 34 (awarding 437.52 hours in a hostile work environment, retaliation, and discrimination case with a seven-day jury trial); *Casmento v. Volmar Constr., Inc.*, No. 20-CV-944 (LJL), 2022 WL 17666390, at *5, 8 (S.D.N.Y. Dec. 14, 2022) (awarding 256.28 hours in a matter involving a six-day trial with "factually complex issues," where "Plaintiff was required to make and respond to numerous motions[,] trial was adjourned once at the request of Defendants, . . . and Plaintiff prepared and argued responses to numerous post-trial motions"); *Danna v. N.Y. Tel. Co.*, No. 87-CV-7250 (CBM), 1991 WL 175881, at *3 (S.D.N.Y. May 6, 1991) (awarding 375.17 hours in a discrimination and hostile work environment matter for which counsel spent "76.5 hours in trial").

However, the total number of hours requested in those matters was much higher than that requested here, and the reduction of hours reflected in the ultimate awards were made for reasons inapplicable to the current matter. In *Abel*, for example, the court rejected plaintiff's request for 672.75 hours because of block billing, vague entries,

quarter-hour increments, excessive billing, duplicative work, and partial success. *Abel*, 2012 WL 6720919, at *30–34. Similarly, in *Casmento*, the court rejected plaintiff's request for 1,139 hours because "certain entries constitute[d] block billing, [were] vague, or request[ed] an award for excessive or unnecessary work," and the fee application "group[ed] together work on claims upon which Plaintiff prevailed and work on claims upon which he did not prevail," claims which "arose from entirely distinct sets of facts and involved distinctive legal theories." 2022 WL 17666390, at *6–8. Lastly, in *Danna*, the court rejected plaintiff's request for 562.75 hours because "[t]he facts in this case were not complex" and plaintiff's attorney conducted "negligible pre-trial discovery." *Danna*, 1991 WL 175881, at *3–4.

Here, the Court does not find excessive billing, vague entries, duplicative work, or billing in quarter-hour increments. Moreover, although Plaintiff did not proceed to trial on all claims brought in the complaint and Plaintiff did not succeed on the discriminatory termination claim, the Court declines to exclude hours dedicated to these claims because all claims were "inextricably intertwined and involve[d] a common core of facts or [were] based on related legal theories." *Quaratino*, 166 F.3d at 425 (quotation marks omitted). Further, although courts may still "consider, among other factors, the degree of success obtained" "[e]ven where unsuccessful claims are not severable," "[t]he task of determining whether to reduce a fee award for limited success is left to the discretion of the district court, and should be guided by the degree of success obtained, rather than by a mathematical approach comparing the total number of issues in the case with those actually prevailed upon." *Abel*, 2012 WL 6720919, at *33 (quotation marks omitted). Therefore, because Plaintiff succeeded on nearly all claims brought to trial, resulting in a substantial award for Plaintiff, and provided highly-detailed billing records that illustrate a reasonable and proportional number of hours

worked for the tasks performed, the Court declines to reduce the fee award. *See Fox*, 563 U.S. at 838 (noting that "[t]he essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection," and that "trial courts may take into account their overall sense of a suit"). Having presided over the trial and based on a careful review of the billing records, the Court finds the 569.6 hours billed by Plaintiff's counsel to be reasonable.

\*   \*   \*   \*   \*

Because the Court finds Plaintiff's counsel's hourly rates and number of hours worked to be reasonable, and in the absence of any objection from Defendants, the Court awards Plaintiff $173,630 in attorneys' fees.

2.  *Costs*

Plaintiff seeks $5,318.80 in costs. (Fees Mot., ECF No. 54, at 17; Fingerhut Decl., ECF No. 53, ¶ 57.) Specifically, counsel seeks (1) $400 for court filing fees; (2) $2,570.30 for depositions; (3) $550 for mediation; (4) $19.60 for postage and delivery; (5) $357 for process servers; and (6) $1,421.90 for transcripts. (Advance Costs Balance, ECF No. 53-3.)

As with fees, it is "the requesting party's burden to support its application, and this means that the required costs must be substantiated." *Lee v. Santiago*, No. 12-CV-2558 (PAE) (DF), 2013 WL 4830951, at \*5 (S.D.N.Y. Sept. 10, 2013). In general, "[a] mere assertion that a certain cost was incurred" is insufficient when "such an assertion is made in a conclusory fashion in a brief or bill of costs, without a supporting affidavit, declaration, or documentation." *Id.* However, applications for fees that include invoices, receipts, or "[a] sworn statement or declaration under penalty of perjury that certain amounts were expended on particular costs" may be deemed sufficient. *Id.*; *see Abel*, 2012 WL 6720919, at \*34 (finding costs "adequately supported" where Plaintiff

submitted a declaration). Although Plaintiff has not provided receipts or invoices, Plaintiff has provided an expense report describing each cost in great detail; this report is incorporated by exhibit to a declaration made under penalty of perjury. (Fingerhut Decl., ECF No. 53, ¶ 57 (stating that "[a] true and correct copy of the expense report is annexed hereto as Exhibit C" (emphasis omitted); Advance Costs Balance, ECF No. 53–3.) Accordingly, the Court finds that Plaintiff has adequately supported the requested costs, which are reasonable and in amounts consistent with the claimed expenses.[17] Given that the types of expenses sought here are reasonable and "routinely recoverable as litigation costs," *Hancock v. I.C. Sys., Inc.*, 592 F. Supp. 3d 250, 258 (S.D.N.Y. 2022), the Court awards Plaintiff's counsel $5,318.80 in costs.

## CONCLUSION

For the foregoing reasons, Defendants' motion for a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59 or, in the alterative, remittitur, is DENIED, and Plaintiff's motion for attorneys' fees, costs, and pre- and post-judgment interest is GRANTED. The Clerk of Court is respectfully directed to enter judgment against Defendants and award Plaintiff the following amounts:

---

[17] As to the requested costs themselves, "plaintiffs may recover costs relating to filing fees, process servers, postage, and photocopying." *Pichardo v. El Mismo Rincon Latino Corp.*, No. 17-CV-7439 (FB) (SJB), 2018 WL 4101844, at *11 (E.D.N.Y. Aug. 7, 2018) (quotation marks and alteration omitted), *report and recommendation adopted*, 2018 WL 4100480 (E.D.N.Y. Aug. 28, 2018). Plaintiffs may also recover the costs of deposition transcripts and other court reporting services. *See, e.g., Kalloo v. Unlimited Mech. Co. of NY, Inc.*, 977 F. Supp. 2d 209, 214 (E.D.N.Y. 2013); *Reiseck v. Universal Commc'ns of Mia., Inc.*, No. 06-CV-0777 (LGS) (JCF), 2014 WL 5374684, at *8 (S.D.N.Y. Sept. 5, 2014), *report and recommendation adopted*, 2014 WL 5364081 (S.D.N.Y. Oct. 22, 2014). Lastly, plaintiffs may recover costs relating to mediation. *See, e.g., Hernandez*, 2021 WL 1413246, at *12.

1) **$150,000** in actual damages ($50,000 from Defendant Oleg Tsimbler, $50,000 from Defendant USA Labor for Hire, Inc., and $50,000 from Defendant RC Global Energy Group, Inc.);

2) Pre-judgment interest on Plaintiff's actual damages award of $150,000, calculated at the rate of interest referred to in 28 U.S.C. § 1961, from January 15, 2020, through the date judgment is entered, compounded annually;

3) **$60,000** in compensatory damages ($50,000 from Defendant Oleg Tsimbler, $5,000 from Defendant USA Labor for Hire, Inc., and $5,000 from Defendant RC Global Energy Group, Inc.);

4) **$50,000** in punitive damages ($40,000 from Defendant Oleg Tsimbler, $5,000 from Defendant USA Labor for Hire, Inc., and $5,000 from Defendant RC Global Energy Group, Inc.);

5) **$173,630** in attorneys' fees;

6) **$5,318.80** in costs; and

7) Post-judgment interest, which shall be calculated from the date the Clerk of Court enters judgment until the date of payment, using the rate set forth in 28 U.S.C. § 1961(a).

**SO ORDERED.**

Dated: Brooklyn, New York
      June 26, 2024

*Taryn A. Merkl*
_____
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE